FILED
2018 Jul-02  PM 04:32
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| WILLIAM MATTHEW HICKS, | § § § | |
| Plaintiff, | § § | |
| | § | Case No. 7:16-CV-01507-LSC |
| | § | |
| CITY OF TUSCALOOSA | § § | |
| Defendant. | § § | |

## MEMORANDAM OF DEFENDANT CITY OF TUSCALOOSA IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT

# TABLE OF CONTENTS

I Material Undisputed Facts ..................................................................... 3

    A. Plaintiff's Employment By the City ....................................................... 3

    B. Firearms Qualification Requirements ...................................................... 3

    C. Requalification and FMLA Leave ........................................................ 5

    D. Reassignment Decisions ................................................................ 7

    E. Plaintiff's Voluntary Resignation ......................................................... 17

II Argument ........................................................................................ 21

    A. Count I - FMLA Retaliation.............................................................. 21

        1. Failure to Promote ............................................................... 22

        2. Other Actions ..................................................................... 26

    B. Count II - FMLA Retaliation .............................................................. 26

    C. Count III - Constructive Discharge ........................................................ 28

    D. Count IV - 42 U.S.C. § 1983............................................................. 29

    E. Count V - Pregnancy Discrimination ..................................................... 29

III Conclusion........................................................................................ 30

# I.

## Material, Undisputed Facts

### A.
### Plaintiff's Employment By the City

1. Following the recommendation of Steve Anderson, (then a lieutenant, now the Police Chief), the Plaintiff, William Matthew Hicks (hereinafter "Mr. Hicks"), was hired by the City of Tuscaloosa as a patrol officer in its police department ("the TPD") on September 6, 2006. (Mr. Hicks Depo., 15, 46-47, 300, 304 and Defendant's Exhibits 1 and 2 thereto).

2. Hicks then attended the Alabama Peace Officers Standards and Training Commission's ("APOSTC") Police Academy (hereafter "the Academy"), from which he graduated in 2007. (Mr. Hicks Depo., 36-37, 44).

### B.

### Firearms Qualification Requirements

3. Even before attending the Academy, Hicks learned of the APOSTC regulation, 650-X-12, which required (and still requires) all police officers in Alabama to pass an annual firearms requalification test with a score of at least 70, (Mr. Hicks Depo., 44-45, 48-49,53-54-55,84-86, 99, 131-33, 312-15, and Exhibit 3 thereto), as well as the City of Tuscaloosa's requirement that its police officers requalify with firearms *twice* each year. (Mr. Hicks

Depo., 84-86, 106, 131).

4. Hicks also learned that if he failed to requalify, he could not bear any firearm as a police officer and could not even serve as a police officer. (Mr. Hicks Depo., 55, 96, 153, 316, 318).

5. Hicks understood that these requirements regarding requalification were mandatory and essential for the safety of the public and his own safety, and for protecting the City of Tuscaloosa from liability. (Mr. Hicks Depo., 29-31, 43, 336).

6. Hicks admits that there was no requirement that the City contact him and schedule or reschedule his requalification, (Mr. Hicks Depo., 49, 53, 59-60), but he admits that the TPD tried to get him requalified on multiple occasions during the time he was on its police force. (Doc. 15, p.4, paras. 19 and 24, and p. 5, paras 29 and 35; Mr. Hicks Depo., 256).

7. Using blanket emails to Hicks as well as all other officers, the City of Tuscaloosa offered firearms requalification twice per year during mandatory training blocks. (Doc. 15, p. 4, paras. 19 and 24; Mr. Hicks Depo. 84-86, 216-18, 256, 277, 311, 483-84, 497-503).

8. Although he was counseled about his inaccuracy with firearms at an early point in his career, Hicks never became an expert marksman. (Mr. Hicks Depo., 33, 42-43, 334-39, and Plaintiff's Exhibit 106).

9.  Hicks also admits he never requalified twice in any one year as required by City policy. (Mr. Hicks Depo., 87, 84, 120-21).

### C.

### Requalification and FMLA Leave

10. Hicks admitted that no one at the City ever even questioned, much less criticized him, for taking FMLA leave. (Mr. Hicks Depo., 158-59).

11. Hicks admits that he could not and need not delay requalification until the City scheduled it, and that he could call the police firing range on New Watermelon Road, where qualified instructors were on duty at all times, and schedule himself for qualification. (Mr. Hicks Depo., 56-59, 88-90, 100).

12. Hicks also knew he could schedule, as well as reschedule, his requalification date by simply filling out a form and submitting it to the TPD, (Mr. Hicks Depo., 58-59, 321), and that he was *required* to submit a request to reschedule if he was unable to attend a scheduled firearms requalification cycle. (Mr. Hicks Depo, 90, 256, 426-27, and Defendant's Exhibit 20, 21, and 22 thereto).

13. But he never did submit any such request between May 23, 2012, and November 25, 2015, (Mr. Hicks Depo., 90-91, 429),  and he admits that nothing prevented him from doing so. (Mr. Hicks Depo., 91-96).

14. His last requalification was on November 21, 2013, after taking FMLA

leave, when he only scored an eighty-two. (Mr. Hicks Depo., 99, 100, 117-18, 120-21, 206-208, 383-84, and Defendant's Exhibit 9 thereto).

15. Although he admits he could have contacted the training division following subsequent medical leaves to reschedule his requalification, he never did, (Mr. Hicks Depo., 95, 98-100), and concedes that he has "some fault" in failing to do so. (Mr. Hicks Depo., 254-55).

16. Hicks has blamed his FMLA leaves for failing to requalify, but he was not out on FMLA leave for the first three-quarters of 2014, and could have easily rescheduled his requalification that year if necessary but did not even contact the TPD Training Division when he returned from FMLA leave that year. (Doc. 15, p.4, para. 25, and p. 5, paras. 30 and 36; Mr. Hicks Depo., 99-100, 107-109, 121, 218, 434-36, 458).

17. Likewise, he was out on FMLA leave for only a brief period in 2015, and could have easily rescheduled his requalification during that year but did not. (Mr. Hicks Depo., 100, 127-31, 133-38, 153, 328-29, 437-39, 441-43, -458).

18. He admitted he had no "good reason" why he failed to simply contact the Training Division by phone, email, or in-person to requalify. (Mr. Hicks Depo., 105).

19. Incredibly, Hicks claims that the year of his last requalification, 2013,

slipped his mind, (Mr. Hicks Depo., 98-104, 131, 140-41, 207), and

admitted that during "my entire 10 years there that, I never kept up with my

APOSTC hours or qualification," (Mr. Hicks Depo., 104, 110-11, 207-208 ),

but he never contacted the TPD Training Division or APOSTC to ask them

about his requalification status. (Mr. Hicks Depo., 111-12, 237).

20. Hicks admits that no one with the City prevented him from complying with

firearms requalification requirements. (Mr. Hicks Depo., 471-73).

21. Although Hicks claims in this lawsuit that the City was out to get him, he

admits that no disciplinary action was taken against him for this gross breach

of APOSTC and TPD requirements. (Mr. Hicks Depo., 320, 406).

## D.

### Reassignment Decisions

22. Chronologically, the first protected activity on which the Plaintiff bases his

claim occurred on September 11, 2014, when he was deposed in his wife's

case by his wife's attorney outside the presence of TPD personnel. (Doc. 15,

p. 4, para. 21; Mr. Hicks Depo., 80-81, 183-87).

23. Hicks admits that no one at the City ever criticized him about this

deposition or her lawsuit. (Mr. Hicks Depo., 184-87).

24. Although he alleges in his Amended Complaint that he subsequently lost

assignments as a Field Training Officer ("FTO") as well as an investigator in

7

the Criminal Investigations Division ("CID"), (Mr. Hicks Depo., 431), the

undisputed truth is that he had also applied for and not received those very

assignments *before* September 11, 2014. (Mr. Hicks Depo., 201, 207-213,

387, 389, 502-503).

25. The Plaintiff applied for, and did not receive a promotion to the rank of

sergeant, (for which he was ranked thirty-sixth out of thirty-seven

applicants) or assignments to the West Alabama Narcotics Task Force

("WANTF") in 2012, to East Precinct FTO in 2013, and to the CID in 2013

(not 2014). (Mr. Hicks Depo., 187, 197, 430-34, 455, and Defendant's

Exhibits 6 and 8 thereto).

26. Assignments to divisions other than patrol were and are made by the Chief

of Police, Steve Anderson, based on the independent, unanimous,

recommendation of review boards, which investigate the qualifications of

each applicant. (Mr. Hicks Depo., 195, 208-209).

27. These review boards, which are composed of ranking officers within the

police department, who meet, review each applicant's personnel files,

receive input from each applicant's supervisor, rank each of the applicants,

and recommend the highest ranked applicants to be assigned in the order

ranked. (Kip Hart Affidavit; Matthew Powell Affidavit).

28. On December 9, 2014, the TPD posted notice of two openings in CID for

8

which Hicks again applied. (Mr. Hicks Depo., 218, 292, and Defendant's Exhibits 10 and 11).

29. Although the Plaintiff admits he cannot recall what year it occurred, he says that when he applied for a CID assignment in either late 2013 or late 2014, he briefly spoke with a lieutenant in the CID division, Perry Madison, about his interest in the assignment, and that Madison stated that "there were people there that felt I was disgruntled because of my wife's pending litigation against the City." (Mr. Hicks Depo., 221-26, 396).

30. Hicks admits that he interpreted this to mean that someone (he says Madison did not identify them) thought Hicks was disgruntled because she had sued the City, not that he had done anything to be retaliated against. (Mr. Hicks Depo., 230-31).

31. Hicks also admits that Lt. Madison never mentioned Hicks's deposition or FMLA leave, or referred to him as being disloyal, (Mr. Hicks Depo., 230, 235), and it is undisputed Madison had nothing to do with the assignment decisions. (Mr. Hicks Depo., 226, 503-504).

32. In accordance with standard procedure, Assistant Police Chief Ronnie Dunn ("Chief Dunn") selected the following ranking officers to serve on the review board for the CID selection: Captain Simpson, Captain Smith, Lieutenant Hart, Lieutenant Teena Richardson, and Sergeant Sanders. (Kip

Hart Affidavit).

33. There were no other members of this board. (Kip Hart Affidavit).

34. Police Chief Anderson did not select any member of this review board, and did not attempt to influence the members regarding their recommendations to him. (Steve Anderson Affidavit).

35. The CID Review Board met on January 7, 2015, and during that meeting the members reviewed each applicant's file, received input from each applicant's supervisor, and ranked the applicants. (Kip Hart Affidavit).

36. This ranking was based solely on the relative qualifications of the applicants, and had absolutely nothing to do with Hicks having given a deposition or taken FMLA leave. (Kip Hart Affidavit; Mr. Hicks Depo., 210-213).

37. The top two candidates, Officers Lamb and Akridge, were ranked and described by the Review Board as follows:

    1. Officer J. A. Lamb. His supervisors stated Officer Lamb is an excellent officer. He is very thorough in his work. He demonstrates a lot of attention to detail, his reports rarely need correction, and he is self-sufficient needing little guidance from supervisors. He demonstrates excellent initiative and willingly takes charge of a scene until higher authority arrives. He has good leadership skills and directs other officers in their work. He makes very good decisions. He serves on the MCRU and is capable of filling any position on the team that is needed. He is very helpful and an excellent team worker.
    2. Officer J. L. Akridge. His supervisors state he is consistently

rated all 5's on his yearly evaluations. He is an excellent officer who needs little supervision. His reports are excellent and he is the "go to guy" on his shift. He is a leader among his peers and willingly assists other officers. The other officers on his shifts, including from other precincts, seek his guidance first. He possesses excellent communications skills.

(Kip Hart Affidavit; Mr. Hicks Depo., 218, 392-94).

38. The Plaintiff was ranked tenth out of nineteenth applicants and the Review Board described him as follows: "His supervisors stated Officer Hicks is an average Officer. He does not call supervisors with a lot of questions. He knows his beats and does a good job of finding people. He is not very proactive and usually only does what is required." (Kip Hart Affidavit; Mr. Hicks Depo., 220, 393-95, and Plaintiff's Exhibit 54 thereto).

39. Contrary to Hicks's wishes, seniority was not, and never has been, a factor in this or any other assignment to a division. (Kip Hart Affidavit; Mr. Hicks Depo., 389).

40. Consistent with prior practice, Chief Anderson ratified the Review Board's ranking and assigned Lamb and Akridge to the positions on January 9, 2015. (Steve Anderson Affidavit; Mr. Hicks Depo., 394).

41. Chief Anderson's decision in this regard was based on the Review Board's independent investigation of the qualifications of the applicants and its recommendation, and had absolutely nothing to do with the Plaintiff having given a deposition or taken FMLA leave. (Steve Anderson Affidavit).

42. The Plaintiff admits he has no evidence to the contrary. (Mr. Hicks Depo., 480, 503-504).

43. Hicks now complains that only one of the Review Board members, Lt. Teena Richardson, was biased against him, but he admits he has no evidence that she even mentioned him to the other board members. (Mr. Hicks Depo., 231-32; see also, Kip Hart Affidavit).

44. Hicks admits he did not file an EEOC charge or even a grievance when he did not receive this CID assignment. (Mr. Hicks Depo., 234-35).

45. The Plaintiff exhausted his FMLA leave on January 9, 2015. (Dawn Barnes Affidavit).

46. From mid-May 2015, he took caregiver leave for 240 hours under the City's SAIL ("Serious Accident and Illness Leave") program. (Mr. Hicks 249, 326-328, 441-43).

47. And as of November 21, 2014, one year after his last APOSTC requalification in 2013, he was out of qualification with his firearm under APOSTC, and far out of qualification under the City's requirement of biannual requalification. (Randy Vaughn Affidavit).

48. As in 2014, the Plaintiff was notified in 2015 on two separate occasions of dates to requalify with his firearms, but did not take these opportunities, (Mr. Hicks Depo., 218, 435-39) or submit a request to reschedule them. (Doc. 15,

pp. 5-6, paras. 29 and 39; Mr. Hicks Depo., 90-91, 218, 429, 435-39).

49. Again, although Hicks's lawsuit claims that he was singled out for punishment, he admits that his annual performance appraisals by his supervisors were good. (Mr. Hicks Depo., 235-37, 406-408, and Defendant's Exhibit 12 thereto).

50. He concedes that his supervisors, who made these annual appraisals, were unaware he had not requalified. (Mr. Hicks Depo., 255).

51. On November 3, 2015, the TPD posted notice of openings for nine FTO assignments. (Mr. Hicks Depo., 238-39, 244, 342-43, and Defendant's Exhibit 13 thereto).

52. As their title implies, the job of an FTO is to train younger, less experienced police officers in the field and to do so by, among other things, setting a good example for them by his or her own conduct. (Mr. Hicks Depo., 204-205, 241-42; Matthew Powell Affidavit).

53. Hicks admits that his failure to requalify in almost two years did not set a good example and that it would quite reasonably cause the Review Board selected to rank the applicants to rank him lower. (Mr. Hicks Depo., 168, 242-43).

54. Nonetheless, before November 17, 2015, Hicks submitted a letter of interest dated November 12 seeking the assignment, and later submitted a formal

application for it. (Mr. Hicks Depo., 239-41, 451-56).

55. Then, although he had been scheduled by the TPD to requalify with his firearm per APOSTC regulations on November 18, 2015, Hicks chose to take a day off on vacation instead and did not attend, and again he did not take the initiative of submitting a request for rescheduling and has no excuse for that omission. (Mr. Hicks Depo., 250-55, 403-404, 443-44, 446-47).

56. Hicks knew he had not requalified.  (Doc. 15, p. 7, para. 48).

57. Hicks complains that after letters-of-interest were submitted, the applicants were requested to submit a form prepared by the Training Department containing their responses to job-related questions, but Hicks admits he is unaware of any evidence this request had anything to do with him, his giving a deposition in his wife's case, or taking FMLA leave. (Mr. Hicks Depo., 454-56; see also, Matthew Powell Affidavit).

58. When Hicks submitted his FTO application on November 25, 2015, he was confronted about his failure to requalify, and required to submit a request to reschedule, at which point he scheduled his requalification for December 2, 2015. (Mr. Hicks Depo., 147-48, 250, 340-41, 345-48, 447).

59. At the time the Plaintiff was on the day shift, and in his application for an FTO assignment he declared that he was unwilling to change to a different shift if he received an assignment. (Mr. Hicks Depo., 451-52).

60. There was no FTO opening for the day shift, and the Plaintiff does not deny that this, too, would work against his assignment. (Hicks Depo., 451-52).

61. Major Clayton Gibbs and Sgt. Matthew Powell selected the following ranking officers to serve as the Review Board for ranking the FTO applicants: Major Gibbs; Captain Hargrove; and Sergeants Palmer, Powell, Webster, Mason and Morgan. (Matthew Powell Affidavit).

62. Police Chief Anderson, who had no involvement in the selection of the FTO Review Board, did not attempt to influence its members regarding whom to recommend. (Steve Anderson Affidavit; Matthew Powell Affidavit).

63. The Review Board met on December 4, 2015, and during that meeting the members reviewed each applicant's file, received input from each applicant's supervisors, and ranked the applicants. (Matthew Powell Affidavit).

64. This ranking was based solely on the relative qualifications of the applicants, and had absolutely nothing to do with Hicks's wife's lawsuit, or Hicks having given a deposition or taken FMLA leave. (Matthew Powell Affidavit).

65. The top nine candidates were ranked by the Review Board as follows: C. Parker; B. Verbine; C. Webster; D. Burroughs; S. R. Smith; J. Mason; D. Terry, T.D. Baily; E. Hall. None of them were in breach of City or APOSTC requalification requirements. (Matthew Powell Affidavit).

66. Hicks was again ranked in the middle of the pack of all applicants and the Review Board described him as follows: "Hicks, W., was noted as having issues in regards to him not being APOSTC qualified with his duty weapon for two years as well as having missed several department mandated trainings that were never made up. "It was also noted that Hicks" is currently not allowed to return to work until completing APOSTC and retraining," but even so was unwilling him to change shifts. (Matthew Powell Affidavit).

67. Meanwhile, rather than requalifying on December 2, 2015, as agreed, he called in "sick" for that day as well as December 3rd and 4th, but did not seek medical attention. (Mr. Hicks Depo., 145-46, 447-50).

68. Hicks now claims he was so depressed during these three days that he was unable to function as a police officer, yet he did not seek medical treatment. (Hicks Depo., 449-51).

69. In his Amended Complaint, Hicks alleged that he told his supervisor he went to DCH EAP on December 2 (Doc. 15 para. 65), but in his deposition he revealed that this was false. (Mr. Hicks Depo., 447-50, 467, and Defendant's Exhibit 23 thereto).

70. Hicks has no evidence that the FTO recommendations were was related in any way to his giving a deposition or taking FMLA leave, or his wife's lawsuit. (Mr. Hicks Depo., 246-47).

71. Consistent with prior practice, Chief Anderson ratified the Review Board's ranking and assigned the top nine candidates to the positions on January 9, 2016. (Steve Anderson Affidavit).

72. Chief Anderson's decision in this regard was based on the Review Board's independent investigation of the qualifications of the applicants and its recommendation, and had absolutely nothing to do with Hicks having given a deposition or having taken FMLA leave. (Chief Anderson Affidavit).

73. Hicks admits he has no evidence to the contrary. (Mr. Hicks Depo., 480).

74. Hicks did not file a grievance or an EEOC charge when he did not receive this FTO assignment. (Mr. Hicks Depo., 247).

## E.

### Plaintiff's Voluntary Resignation

75. The length of Hicks's non-qualification with firearms during his employment was longer than that of any other Tuscaloosa Police Officer. (Randy Vaughn Affidavit; Mr. Hicks Depo., 473-74).

76. When Hicks returned to work on December 5, 2015, he was required to submit an interdepartmental report explaining why he had not requalified for such a long period of time. (Mr. Hicks Depo., 71-76, 348-51, 429-30; Doc. 15, p. 8, paras. 55-64).

77. In that report, he falsely represented that, with the exception of one day, the

only reason he had not requalified was that he had been on medical and caregiver leave. (Mr. Hicks Depo., 73-74, 248-252, 349-51, 457 and Defendant's Exhibit 14 thereto).

78. On December 5, 2015, his supervisor had to drive Hicks to the range, where Hicks finally requalified. (Mr. Hicks Depo., 147, 154, 348-51; Doc. 15, para. 67).

79. Per the instructions of Captain Randy Vaughn, the head of the TPD Training Division, Hicks was required to requalify a second time on December 9, 2015 (where he scored lower than the prior week), and to attend a brief period of additional target practice, (Hicks now calls this target practice "remedial training"), all in an attempt to catch him up with what he had missed since 2013. (Randy Vaughn Affidavit; Doc. 15, p. 9, paras. 70-71; Mr. Hicks Depo., 74-76, 163-66, 349, 351-52, 459-63, 467-68).

80. Hicks admits that firearms accuracy is a perishable skill, that a police officer should practice at least twice per month, that additional target practice was therefore a good thing, "a blessing," and that requiring it of him was reasonable given what he had missed since 2013. (Mr. Hicks Depo., 30-31, 33-36, 42-44, 159-67, 286).

81. Hicks also admits that the TPD had no limitations on prescribing remedial training, (Mr. Hicks Depo., 63-65), and that he has no evidence it was

retaliatory. (Mr. Hicks Depo., 170).

82. Hicks raises an issue regarding the mistaken disposal of some of the records regarding this FTO selection process, but admits he has no evidence this had anything to do with him, or that it was part of some cover-up. (Mr. Hicks Depo., 453-54).

83. On December 16, 2015, Hicks received a documented counseling for failing to requalify for such a lengthy period of time. (Doc. 15, p. 9, para. 74; Mr. Hicks Depo., 155-63, 353-55, and Plaintiff's Exhibit 38 thereto).

84. The purpose of a counseling is not disciplinary, but instead is merely to document a conversation where a supervisor has coached a subordinate to correct behavior. (Mr. Hicks Depo., 81-83, and Defendants' Exhibit 5, p. 2 thereto).

85. Hicks has no evidence this counseling was motivated by his taking FMLA leave or by his wife's lawsuit. (Mr. Hicks Depo., 170).

86. Nonetheless, on December 22, 2015, the Plaintiff submitted his first and only grievance, which made no mention of retaliation or the assignments to CID or FTO, and instead focused merely on the fact that he had been counseled with about not qualifying, and required to requalify twice and take more target practice. (Mr. Hicks Depo., 266, 353, 359-60, and Defendant's Exhibit 15 thereto).

87. And contrary to the mandated procedure, which required grievants to first submit grievances within the chain of command within the TPD, Hicks submitted this grievance directly to the City's Human Resource Department, leading to a second counseling on December 30, 2015. (Doc. 15, p. 10, para. 79-84; Mr. Hicks Depo., 65-69, 76, 360-64, and Defendants Exhibits 4, and Plaintiffs Exhibits 109 and 110, thereto).

88. Hicks admits that following the chain of command with the City is important, and that no one with the City told him to skip his chain of command within the TPD in connection with his grievance. (Mr. Hicks Depo., 257).

89. Since 2013, the Plaintiff had been pondering resigning from the TPD because of his "hate" to even get off his couch, put on his uniform, and go to work, and because of the resulting stress from that. (Mr. Hicks Depo., 145, 148-50, 169-73, 175, 243, 470-71).

90. Hicks admits that no one with the City ever asked him to resign. (Mr. Hicks Depo., 257).

91. On December 30, 2015, before that second counseling, Hicks submitted his voluntary resignation, which was accepted, at which point he turned in his service weapon and other City property. (Mr. Hicks Depo., 173-80, 257-61, 367-71, 374-75, 464-65, 469-70, and Defendant's Exhibit 16 thereto).

92. Rather than requiring Hicks to work out a two week notice period despite his job stress, Police Chief Anderson allowed him to go on *paid* administrative leave for that period. (Mr. Hicks Depo., 145, 261, 370-71, 412-13, 450-51, 458-59, 490-92; Steve Anderson Affidavit).

93. Hicks is unaware of any evidence that this was inconsistent with prior practice regarding such leave. (Mr. Hicks Depo., 458-459).

94. Hicks testified that he used this period to spend quality time with his family. (Mr. Hicks Depo., 261, 463-64)

95. Hicks's wife's lawsuit was tried in February 2016, and resulted in a verdict for her on certain claims but not on others. (Doc. 14, p. 12, para. 96).

96. The Plaintiff did not testify in that trial but filed his first and only EEOC charge on April 21, 2016, after that verdict. (Mr. Hicks Depo., 268, and Defendant's Exhibit 18 thereto).

## II

## Argument

## A

## Count I-FMLA Retaliation

In Count I of his Amended Complaint, the Plaintiff alleges that he was retaliated against for giving a deposition in his wife's lawsuit against the City of Tuscaloosa. That deposition occurred on September 11, 2014. (Doc. 14, p. 12,

para. 100).[1] He further alleges that this retaliation consisted of a failure to promote him, "writing him up," sending him to a remedial firearms class, placing him on paid administrative leave when he resigned, "stripping" him of his city-owned police gear following his resignation, and then escorting him out of the TPD headquarters building. (Doc. 14, pp. 12-13, paras. 100-102). As will be discussed below, this claim—like his other claims- is patently frivolous and the product of paranoia, an active imagination, a lust for money, or all of these.

Hicks must show that: (1) he engaged in statutorily protected activity; (2) he suffered a material adverse action; and (3) there is a causal connection between the protected activity and the materially adverse action. If he shows this, and the City proffers a legitimate, nonretaliatory reason for its actions, then he must show that the reason given is pretextual. Doc. 23, p. 8; Godwin v. Corizon Health, _____Fed. Appx. _____, 2018 WL 2017903, *3(11th Cir. 2018), citing Brown v. Ala. Dept. Of Transp., 597 F. 3d 1160, 1181 (11th Cir. 2010).

### 1.  Failure to Promote

There were only two "promotion" decisions made after the Plaintiff gave his 2014 deposition, neither of which involved a promotion in rank or anything over $42.44 per pay period pay increase. One involved an assignment to CID in January 2015, and the other to an FTO position in January 2016. It is the Plaintiff's burden

---

[1] That Count does not predicate a retaliation claim on Hicks taking FMLA leave.

to establish that no reasonable person could have chosen the promotion candidates selected over him. Springer v. Convergys Customer Management Group, Inc., 509 F. 3d 1344, 1349 (11th Cir. 2007). He cannot carry that burden under the facts of this case.

The decision on the CID position was made on January 9, 2015, after the Review Board ranked the applicants. This was almost four months after the deposition. As a matter of law this lengthy interval of time precludes any inference of a causal connection between the two events. Doc. 23, p. 8; Godwin v. Corizon Health, at *3, citing Thomas v. Cooper Lighting, Inc., 506 F. 3d 1361, 1363-64 (11th Cir. 2007) ("a three month interval between the two is insufficient to establish a causal connection as a matter of law); Barnett v. Athens Regional Medical Center, Inc., 550 Fed. Appx. 711, 715 (11th Cir. 2013) (six month gap was also fatal). [2]

The Plaintiff has no evidence of retaliation. He admits that no one with the City ever even criticized him for giving the deposition or about his wife's lawsuit. (Mr. Hicks Depo., 184-87). Moreover, the decision regarding the CID assignment, which the City has consistently stated was based on each candidate's prior performance, was based solely on the relative qualifications of these applicants. See Zaben v. Air Products & Chemicals, Inc., 129 F. 3d 1453, 1458-59 (11th Cir.

---

[2] The FTO position assignment decision was made over a year after the deposition and is likewise lacking in the requisite proximity.

1997) (general consistency). The Review Board process assured this, and Police Chief Anderson did not vary from that Board's recommendations. (Steve Anderson Affidavit).

It is noteworthy that the Plaintiff sought and did not receive another assignment to CID in early 2014, long before he gave his deposition. He had been unsuccessful in achieving high rankings and receiving assignments even before this, and before his wife had any issue with the City in late 2012. He cannot blame his consistently low rankings on retaliation.

Contrary to the allegations in his Amended Complaint, there is no evidence that Lt. Teena Richardson, a member of the CID Review Board, harbored any discriminatory or retaliatory animus toward Mr. Hicks. (Kip Hart Affidavit). Moreover, she was only one member of the five person Review Board, and it is Hicks's burden to prove that a majority of the members of the board were actually motivated by an illegal animus. Her animus, if any, cannot be imputed to them. White v. Beaulieu Group, LLC, 2017 WL 2243024, *6 (N.D. Ala 2017); Ballard v. Chattooga County Board of Tax Assessors, 2013 WL 12176928, *35-36 (N.D. (Ga. 2013); Collier v. Clayton County Community Service Board 236 F. Supp. 2d 1345, 1371-77 (N.D. Ga. 2002); Sherrod v. Palm Beach County School Dist., 424 F. Supp. 2d 1341, 1345 (S.D.Fla.2006). Accord, Russell v. University of Texas of Permian Basis, 234 F. 3d. Appx. 195, 203 (5th Cir. 2007); Silvera Bd.  v. Orange

County School Bd. , 244 F. 3d 1253, 1262 (11th Cir. 2001); Matthews v. Columbia County, 294 F. 3d 1294, 1297 (11th Cir. 2002); Campbell v. Rainbow City, Ala., 434 F. 3d 1306, 1313 (11th Cir. 2006); Mason v. Village of El Portal, 240 F. 3d 1337, 1339 (11th Cir. 2001). Cf., Neal v. T-Mobile USA, Inc., 700 Fed. Appx. 888, 890 (11th Cir. 2017) (a plaintiff cannot rely on the doctrines of constructive knowledge and/or presumed intent).

In the Amended Complaint Hicks falsely alleged that after Hicks did not receive a CID assignment, he spoke to a CID supervisor, Perry Madison, who commented that there were "people" who felt Hicks was "disgruntled." In his deposition, however Hicks testified that he could not recall whether this alleged conversation occurred in 2013 or 2014, but he is sure that it was at some point before his application for CID assignments in one of those two years. The Plaintiff admitted that Madison never even mentioned his deposition in her case. It is also undisputed that Madison had nothing to do with the CID assignment decision.

Finally, to the extent Hicks argues that he should have been chosen because of his seniority or his disciplinary record, that is merely an attack on the wisdom on the decision, which is not relevant. Duke v. Shelby County Board of Education, 2018 WL 9256, *9 (N.D. Ala. 2018) (Judge Proctor) see also, Roper v. Foley, 177 Fed. Appx. 40, 48-49 (11th Cir. 2006) (an employer is not required to make promotion decisions based on seniority).

## 2. Other Actions

The other actions the Plaintiff alleges were adverse – the "write-ups", the "remedial" firearms class, the administrative leave, and being required to turn in City property in his possession—occurred in late 2015, over a year after he gave his deposition in 2014. Thus, he cannot show a causal connection between them. Godwin v. Corizon Health, supra. The Plaintiff also admitted that he has no evidence of such a connection. Again, no one ever even criticized him for giving a deposition.

## B.

## Count II – FMLA Retaliation

Unlike Count I, Count II is actually a claim for retaliation for taking FMLA leave, but not for a failure to promote. (Doc. 14, p. 14, paras. 106-107).

Hicks took FMLA leave on two occasions. The first was from October 2013, to November 11, 2013, (Mr. Hicks Depo., 384-85, and Plaintiff's Exhibit 116 thereto), and the second was from October 9, 2014, to January 12, 2015. (Mr. Hicks Depo., 121).[3]  He was never criticized for any occasion he took FMLA

---

[3]  This leave, which exceeds twelve weeks, exhausted his FMLA leave. (Dawn Barnes Affidavit; and 29 C.F.R. 825. 200 (FMLA leave is limited to 12 work weeks during a 12 month period.) See also, Johnson v. Vintage Pharmaceuticals, Inc., 185 Fed. Appx. 798 (11th Cir. 2006) (employer allowing more leave does not

leave. (Mr. Hicks Depo., 158-59).

And the acts upon which Hicks relies as "retaliation" in Count II did not occur until November or December of 2015. Thus, there was no time proximity between the protected activity and the alleged retaliation, and so no evidence of causation.

Those acts he calls "retaliatory" were fully justified by legitimate, non-retaliatory reasons. Hicks, contrary to APOSTC regulations *and* City requirements, had not re-qualified with his firearm for two years. Even when he was not on FMLA leave, he did not lift a finger to re-qualify. He was repeatedly notified by the TPD of opportunities to requalify in 2014 and 2015, yet did not take advantage of them or seek to reschedule one single time, despite acknowledging that his seeking to reschedule was also mandatory. After he missed his last TPD scheduled re-qualification period on November 18, 2015, his supervisor had to confront him and require him to fill out the form requesting rescheduling. In other words, this was not done on Hicks's initiative. Adding insult to injury, on the date to which he requested his requalification be rescheduled, December 2, he called in "sick" and did not go to the firing range to re-qualify. He also did not seek medical attention for this "sickness", but then lied to his supervisor and told him he went to DCH

_____

convert it into FMLA leave). Once the Plaintiff's FMLA was exhausted he was required to work 1250 hours to acquire more FMLA leave.

EAP that day. And when he was subsequently requested to submit a report explaining why he had not qualified since 2013, he falsely stated that it was because he was on FMLA leave.

The true reason for Hicks blatant disregard of firearms re-qualification rules may be inferred, but it is crystal clear that by doing this he put the City, its citizens and himself at risk. If he had used deadly force during this period and done so inaccurately, the injured person or persons would have sued him and the City and alleged a failure-to-train claim. Discovery in that litigation would quickly reveal his failure to requalify.

Hicks alleges that he was verbally reprimanded and "written up" for this, (Doc. 14, p. 13, para. 107), and now he has the gall to complain that he was required to attend what he calls "remedial" firearms training. (Doc. 14, p. 13, para., 107).  This was intended to try to catch him with all of the firearms training he had missed in two years. Tellingly, in his deposition, he described it as merely consisting of a brief period of extra target practice, which he admitted was actually a "blessing". Indeed.

## C.

### Count III- Constructive Discharge

The Plaintiff includes an allegation of constructive discharge in Count II as well as Count III, but this Court previously dismissed those claims. (Doc. 23, p. 10-11).

## D.

### Count IV -42 U.S.C §1983

This claim has also been dismissed. (Doc. 23, pp. 11-19).

## E.

### Count V – Pregnancy Discrimination

The only new retaliation claim here is that the Plaintiff was denied a "promotion" because he testified in his wife's lawsuit and took FMLA leave. (Doc. 14, pp. 17-18, paras. 124, 125, 128 and 129). As discussed above, both of the "promotion" decisions took place well after the Plaintiff gave his 2014 deposition. The decision regarding the CID assignment occurred on January 9, 2015.[4] The decision regarding the second assignment, to FTO, was made on January 9, 2016.

---

[4] It also occurred more than 180 days before the Plaintiff filed his EEOC charge. (Doc. 14, Exhibit B; Hicks Depo., 268).

The failure to promote claim based on taking FMLA leave is likewise baseless. As discussed above, the CID decision was based solely on the superior qualifications of the assignees, not the FMLA. Hicks took no FMLA leave within three months before the FTO decision in January 2016. Hicks has no evidence that connects his protected acts with these decisions. The FTO decision was made at a time when the Review Board knew the Plaintiff had inexcusably failed to requalify over a long period, demonstrating that he simply did not have the right stuff to train young officers in their responsibilities to the public, the City, and the TPD.

## III

## Conclusion

For the reasons discussed above, the City is entitled to summary judgement on all remaining claims.

Christopher Lyle McIlwain, Sr. (MCI-002)
Hubbard, McIlwain & Brakefield, P. C.
808 Lurleen Wallace Blvd., N.
P. O. Box 2427
Tuscaloosa, AL  35403
Telephone: (205) 345-6789
Attorney for Defendant City of Tuscaloosa

## CERTIFICATE OF SERVICE

I hereby certify that on July 2, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all parties, and I hereby certify that, to the best of my knowledge and belief, there are no non-CM/ECF participants to whom the foregoing is due to be mailed by way of the United States Postal Service.

Of Counsel

29