FILED

2018 Aug-15  PM 08:28
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **WILLIAM  MATTHEW HICKS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **CV-2016-CO-1507-W** |
| **CITY OF TUSCALOOSA (TUSCALOOSA** | ) | |
| **POLICE DEPARTMENT),** | ) | |
| | ) | |
| **Defendants** | ) | |

## PLAINTIFF'S BRIEF IN OPPOSITION
## TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## **TABLE OF CONTENTS**

I. RESPONSE TO MOVANTS FACTS . . . . . . . . . . . . . . . . . . . . . . .  1

   A. UNDIPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

   B. DISPUTED FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II. PLAINTIFF'S STATEMENT OF ADDITIONAL UNDISPUTED
   FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III. PREGNANCY DISCRIMINATION RETALIATION . . . . . . . . . . . . 31

IV. FMLA RETALITATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

V. ANALYSES OF ELEMENTS . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . 34

     A. PROTECTED ACTIVITY . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

     B. ADVERSE EMPLOYMENTACTION . . . . . . . . . . . . . . . . . . . .  35

     C. CAUSATION AND PRETEXT . . . . . . . . . . . . . . . . . . . . . . . . .  35

       1) Retaliation for Taking FMLA Leave-2014 CID posting . . .  36

       2) Retaliation for Testifying in FMLA case-2014 CID posting.  36

       3) Retaliation for Testifying in FMLA and Pregnancy
         Discrimination Case 2015 FTO Posting . . . . . . . . . . . . . . . . 42

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

# TABLE OF AUTHORITIES

42 U.S.C. § 2000e–3(a)                                                    31

Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir.2000)      32

Morgan v. City of Jasper, 959 F.2d 1542, 1547 (11th Cir.1992)          32

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).                                                    32

Smith v. Lockheed-Martin Corp., 644 F3d 1321, 1327 (11th Cir. 2011). 32

Yates v. Ala. Agric. & Mech. Univ., 2014 U.S. Dist. LEXIS 45218, *16 (N.D. Ala. Apr. 2, 2014).                                               32

Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).                                                                     33

Hunt v. Cormartie, 526 U.S. 541, 533, 119 S.Ct. 1545, 1552 (1999).   33

Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir.2008)         33

Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir.2010)                                                                    33

Calvert v. Doe, 648 Fed. Appx. 925, 929 (11th. Cir. 2016)            33

Strickland v. Water Works & Sewer Bd. Of Birmingham, 239 F.3d 1199 (11th Cir. 2001).                                                            34

Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234-1235 (11th Cir. 2010)                                                                         34

Hill v. Branch Banking and Trust Company, 264 F.Supp.3d 1247 (N.D. Ala. 2017).                                                                 34

Thompson v. North American Stainless, LP, 562 US 170, 131 S.Ct. 863, 178
L.Ed.2d 694 (2011)                                                    34, 35

Brungart v. BellSouth Telecomm, Inc., 231 F.3d 791, 98 (11th Cir. 2000).
                                                                        35

Webb-Edwards v. Orange Cnty Sherriff's Office, 525 F.3d 1013, 1031 (11th Cir.
2008).                                                                  35

Doe v. Dekalb County School District, 145, F.3d 1441, 1447
(11th Cir. 1998)                                                        35

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3rd Cir. 2000)   36

Wells v. Colorado Department of Transportation, 325 F.3d 1205, 1217 (10th Cir.
2003)                                                                   36

 Soto-Feliciano v. Villa Cofresi Hotels, Inc. 779 F.3d 19, 32 (1st Cir. 2015)
                                                                        36

Emeldi v. University of Oregon, 673 F.3d 1218 (9th Cir. 2012).          36

Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006).                   36

Jones v. Gulf Coast Heath Care of Delaware, LLC, 854 F.3d 1261, 1272 (11th Cir.
2017)                                                                   36

Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)                 37

Joyner v. City of Atlanta, et. al., No. 1;16-cv-1780-TWT-LTW (N.D. Ga. Feb. 23,
2018)                                                                   37

Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3rd Cir. 2000)   37

Frazier v. City of Mobile, 2018 WL 692933 *14 (S.D. Ala. 2018)         37

Letieri v. Equant Incorporated, 478 F.3d 640, 650 (4th Cir. 2007).     37

Taylor v. Cardiovascular Specialists, P.C., No. 11-4521-TCB-RGV, 2013 U.S. Dist. LEXIS 186090, at *97-98 (N.D.Ga. Dec. 11, 2013).                    37

Freeman v. Perdue Farms Inc., 496 Fed.Appx. 920, 926 (11th Cir. 2012)
                    37

Greathouse v. Premier Beverage Co., No. 8:08-cv-1170-T-30TGW, 2009 U.S. Dist. LEXIS 97436, 2009 WL 3429796, at *10 (M.D. Fla. Oct. 21, 2009).
                    37

Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1117-19 (11th Cir. 2001).                    38

Joyner v. City of Atlanta, et. al., No. 1;16-cv-1780-TWT-LTW (N.D. Ga. Feb. 23, 2018).                    38

Lee v. N.M. State Univ. Bd. Of Regents, 102 F.Supp.2d 1265, 1277 (D.N.M. 2000                    38

Austrum v. Federal Cleaning Contractors, Inc., 149 F.Supp.3d 1343 (S.D. Fla. 2016)                    38, 47

Morris v. Bessemer Board of Education, 2013 WL 549896 (N.D. Ala. 2013)
                    39

Hasham v. California State Baord of Equalization, 200 F.3d 1035 (7th Cir. 2000)
                    40

Simmons v. Camden Cty. Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985)
                    40

Chapman v. A1 Transport, 229 F.3d 1012 (11th Cir. 2000)                    41

Ash v. Tyson, 546 U.S. 454, 457, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006)                    42, 46

Walker v Prudential Property and Cas. Ins. Co., 286 F.3d 1270 1279 (11th Cir. 2002                    43

<u>Padilla-Owens v. Sandia Nat'l Labs</u>, No. 02-0448 JB/WDS, No. CIV 02-0448
JB/WDS, 2003 WL 24153912, at *12 n.6 (D. N.M. Nov. 25, 2003      44

<u>Brown v. Houser</u>, 129 Scup. 1357 (N.D. Ga. 2015).      45

<u>Waddell v. Small Tube Products, Inc.</u>, 799 F.2d 69, 73 (3d Cir.1986)   45

<u>EEOC v. L.B. Foster Co.</u>, 123 F.3d 746, 753–54 (3d Cir.1997), *cert. denied*, 522
U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998).      45

<u>Chapman v. A1 Transport</u>, 229 F.3d 1012 (11th Cir. 2000)      45

<u>Mohammed v. Callaway</u>, 698 F.2d 395, 400-01 (10th Cir. 1983)      45

<u>EEOC v. Am. Nat'l Bank,</u> 652 F.2d 1176, 1195 (4th Cir.1981)      48

## PLAINTIFF'S RESPONSE TO SUMMARY JUDGMENT

The Defendant's motion for summary judgment is due to be denied because Hicks established the elements of each of his claims, and the stated reasons for the non-selections are false and pretextual.

### I.   RESPONSE TO MOVANT'S FACTS

#### A.   UNDISPUTED FACTS

The Plaintiff admits paragraphs 1, 2, 10, 14, 19, 24, 25, 28, 29 33, 37, 40, 44, 49, 51, 52, 54, 58, 59, 61, 71, 76, 78, 84, 86, 88, 89, 90, 94, 95, 96.

#### B.   DISPUTED FACTS

**3**.  Denied in part.  City policy requires officers to comply with the APOSTC rules. (PX-9, 4-4.1; PX-38, 10.1.3, 10.1.6; PX-40, Dep. Maj. Gibbs, p. 21:2-9; PX-58, Dep. Powell, p. 103:7-10 (TPD requires recertification once per year)).

**3-2.**   APOSTC requires officers to qualify once per year and take 12 hours of continuing education. (APOSTC policy PX-10 Rule 650-X-12.02(1) Rule 650-X-12.03(1), Dep. Carroll PX-20, p. 10:15-23).

**3-3.**  Michelle Carroll, who schedules training, stated firearms requalification is offered twice a year in case an officer misses a training, because it is common for officers to miss recertification for surgery or other reasons. (Carroll Dep. PX-20, p. 32:19-23; *See Also,* Dep. Maj. Gibbs PX-40, p. 22:9-13; Dep. Vaughn PX-19, p. 11-12, 19-20, 22-23).

1

**4**. Mischaracterized. When Hicks was asked what this meant, he testified if an officer did not pass the test, he was not in compliance. (Dep. Hicks, PX-1, p. 318).

**5.** Denied. Hicks does not state the requirements are mandatory and essential, Hicks testified the use of a firearm is essential and discussed the importance of accuracy and practice. (Dep. Hicks, PX-1, p. 29-31, 43, 336).

**6**. Mischaracterized and denied. Counsel questioned Hicks about a different policy that doesn't contain the language. (Dep. Hicks PX-1, p. 483-484).

**6-2**. Training and the firing range are both under the direction of the training coordinator who is directly responsible to the Chief, and policy requires the range officer to schedule/coordinate the use of the firing range for training. (PGO 56(a), II(A) PX-67; PGO 37 Section 1, and 1.2 PX-49; Dep. Palmer PX-92, p. 19, Dep. Vaughn PX-19, p. 50:9-14).

**6-3.** It is the department's responsibility to ensure its officers are qualified once per year, and report the scores to APOSTC each year. (Rule 650-X-1-16 (1) PX-50,; Dep. Vaughn PX-19, p. 58-59:1-12; Dep. Hicks PX. 1, p. 49:21-23).

**6-4.** Both policy and custom are clear that once the Chief's assistant is notified the officer is no longer on light duty, she notifies training,  then training is responsible for contacting the officer to schedule him to requalify before going back on patrol. (Dep. Vaughn PX-19, p. 16, 57, 66:2-6, 82; Dep. Hicks PX-1, p. 94-95, 97, 105:15-17; Note from Officer Kline PX-34; Audio of Officer Kline PX- 96; PX-18).

**6-5.** Rescheduling APOSTC goes through both the supervisor and the training department. (PX-49 Section 3.3; Dep. Carroll PX-20, p. 21, 31-32; Dep. Palmer PX-92, p. 21; PX-19, p. 16).

**6-6.** Neither Hicks supervisor, nor training contacted him to recertify before sending him back to patrol. (PX-1, p. 110, 124; 483-484).

**7.** Denied in part. Training was mandatory *unless* on approved leave. See below.

**7-2**. Officers on FMLA, light duty, or approved leave do not requalify until they are released back to patrol *full duty*, and the list of officers who do not qualify for the year for this reason are reported to APOSTC without issue. (Dep. Hicks PX-1, p. 86:15-20; 106, 109; Dep. Carroll PX-20, p. 47 (training has never brought anyone on FMLA, SAIL or light duty to come in to requalify); Dep. Maj. Gibbs PX-40, p. 55-56; Dep. Powell PX-58, p. 126; Dep. Vaughn PX-19, p. 12-16, 135-137).

**8**. Mischaracterized. Hicks only informal counseling in his entire file for 10 years until this case was in 2006 when he was in training learning firearms for the first time *before* he was sworn in as an officer. (Dep. Hicks PX-1, p. 334-336).

**8-2**. Hicks was never considered a problem shooter, and had no problems qualifying. (Dep. Vaughn PX-19, p. 18; Dep. Hicks PX-1, p. 126, 147).

**9**. Denied. Hicks did not state he never qualified twice. He repeatedly testified he didn't remember the dates of qualifications. (Dep. Hicks PX-1, p. 86-87).

3

**11.** Denied. This is not Hicks testimony. Hicks stated nothing says he has to wait, and he repeatedly testified "if someone was out there, and stated he had called an no one was there. (PX-1, p. 56-69, 88-90, 100).

**12**. Denied. There was no policy for rescheduling while on FMLA, Hicks remembers another form he submitted on November 25, 2015, and he claims he doesn't remember all the other forms he filled out, but if he missed while not on approved leave he would have been written up. (Dep. Hicks PX-1, p. 90-93, 97; Maj. Gibbs Dep. PX-40, p. 22:14-18).

**12-2. November 25, 2015**, Hicks appeared to reschedule his training date and to submit his newly required application package for FTO to training, when they "discovered" Hicks had not qualified so Hicks volunteered to go shoot right then. (Dep. Hicks PX-1, p. 90-93, 99, 104, 138, 140, 250).

**13**. Mischaracterized. On **November 21, 2013**, Hicks recertified his weapon so there was no need to submit paperwork, as he was on FMLA where there was no policy for rescheduling with a form.  (PX-1, p. 90-93, 97, 447; Recert. PX-8; email PX-18).

**15, 20, 79**.  Denied as characterized. Hicks turned in the form to return to work, as required. (PX-1, p. 95-97).

**15, 20, 79--2.** On **November 25, 2015**, Sgt. Castleberry refused Hicks' offer to qualify, and told him to wait until his new training date, December 2, 2015. (Dep. Vaughn PX-19, p. 17; Dep. Hicks PX-1, p. 142-143, 148).

**15, 20, 79--3**.  Sgt. Castleberry, a licensed instructor, could have administered the test that day as officers can go shoot anytime, and any firearms instructors can go down to the range and qualify someone. (PX-20, p. 25; Dep. Hicks PX-1, p. 142).

**15, 20, 79--4**. Hicks was sent back to patrol to perform his regular job duties. (PX-1, p. 110).

**15, 20, 79—5.** Around **November 30, 2015**, Hicks went to the range to practice, and asked Sgt. Chronister, firearms instructor, to qualify him, but he told Hicks to practice and did not administer the test. (PX-1, p. 138-139, 143-144, 148).

**16**. Mischaracterized. Hicks wasn't out of certification until November, 2014 which was after he was on leave. See below.

**16-2. October 9, 2014**, Hicks went on approved FMLA for shoulder surgery. (FMLA docs. PX-17; FMLA approval, PX-102).

**16-3**. On **November 23, 2014**, while Hicks was still out on FMLA leave, his APOST certification became due. (recert. PX-8, email from Vaughn PX-18).

**17, 18**. Denied as characterized. After FMLA, Hicks went on light duty until March/April (he was not allowed to qualify) then back on leave May to July 8, 2015.

**17, 18—2. January 12, 2015**, Hicks returned on light duty after his shoulder surgery. (email and light duty app. PX-17; PX-101, PX-1, p. 122 *See* 7-2).

**17, 18--3**. **March or April, 2015**, Hicks returned to patrol without restrictions, he notified the assistant to the Chief, Ms. Langston, as required, that his restrictions

were lifted, but she did not notify training or Hicks to recertify. (Dep. Vaughn PX-19, p. 92; FMLA papers PX-17; Dep. Hicks PX-1, p. 105, 121-122, 126, 323-325, 329, *See ¶* 6-4 above).

**17, 18--4**. **May 17, 2015**, Hicks went on approved FMLA for the birth of his son. (FMLA application, PX-59; FMLA approval PX-100; Dep. Hicks PX-1, p. 327).

**17, 18--5**. On **July 8, 2015**, Hicks returned from FMLA for birth of his son and followed the same procedure notifying Ms. Langston. (FMLA leave extended PX-60; Dep. Hicks PX-1, p. 127, 323-325, 328-329).

**17, 18--6**. Each time he returned he turned in the paperwork. (PX-1, p. 95-97).

**21**. Denied. Hicks was disciplined three times (verbal (12-5), remedial training (12-9) and disciplinary action-informal counseling (12-16)), for the same "offense" even though APOSTC never revoked his qualification. (Dep. Hicks PX-1, p. 72, 75).

**22**. Denied. In **December, 2012**, Cpt. Robertson told Mrs. Hicks, also a TPD employee, he was sending her to patrol immediately because she and *her husband* were talking about her treatment in WANTF.  (PX-4; Tr. Tran. PX-23, p. 819-821).

**22-2.**  On **April 22, 2013**, Hicks' wife filed an EEOC charge, which goes directly to the Chief, against the City alleging pregnancy discrimination. (Charge PX-3; Washington Dep. PX-21, p. 10; Dep. Chief, PX-91, p. 11-12).

**22-3. August 14, 2013**, the EEOC issued Mrs. Hicks' "Right to Sue". (RTS PX-5).

**22-4.** **November 12, 2013**, Mrs. Hicks filed her lawsuit alleging Title VII (gender) and FMLA violations against the City. (Complaint PX-7).

**22-5.** **September 11, 2014**, Hicks was deposed. (Dep. old case PX-14; PX-1, p. 81).

**22-6.** **December 19, 2014**, the City posted another CID position and scheduled it to close on January 2, 2015. (Posting, PX-22).

**22-7.** On **December 24, 2014**, Hicks came in while he was still on leave and turned in his application for the CID position. (Letter of interest, PX-81).

**22-8.** When turning in his **December, 2014** CID application, Lt. Madison (the supervisor over CID-where Hicks is applying) inquired whether Hicks felt his wife's case was preventing him from promotions and stated to Hicks that "there are certain people here at the City think you are disgruntled", which startled Hicks and he told Lt. Madison he loves his job, but also informed him he *supports his wife*. (Dep. Hicks PX-1, p. 221-223).

**23, 30, 31**. Denied as characterized. Hicks also testified Madison did not specifically say those things, however, he also testified Madison said people thought he was *disgruntled* with the City because of his wife's lawsuit suit during a conversation about whether his *wife's case was preventing him from getting CID*, and he agreed with Hicks he was in a tough situation. See (Dep. Hicks PX-1, p. 221-223, 230).

**26, 32, 34**. Denied in part. Chief Anderson determines who is on the selection board and notifies them they are to serve by email. (PX-40, p. 15, 17).

**27, 35, 36, 41**. Denied in part. The rankings aren't based on qualifications, Hicks' qualifications were superior, and. Richardson admits she did not even review Hicks' files during the selection process. (PX-28, p. 48). See below.

**27, 35, 36, 41--2**. **January 8, 2015**, the Selection Board choose Lamb and Akridge for CID, which was ratified by Chief Anderson and memorialized in special order 1334 dated January 9, 2013. (Selection Board memo PX-30, Special Order PX-31).

**27, 35, 36, 41--3.** Lamb and Akridge jumped numerous spots past Hicks to become 1 and 2. (Lamb jumped from 10 to 1 and Akridge jumped from 12 to 2 when Hicks was previously 2 and jumped to 9) (PX-12; PX-82).

**27, 35, 36, 41--4**. Grammer jumped from 31 to 5, Verhine jumped from 19 to 7, and Parker from 32 to 8, each ahead of Hicks for no good reason. (PX-12, PX-82).

**27, 35, 36, 41--5**. An officer would have to greatly step up their performance to jump so many spots. (PX-28, p. 48-49).

**27, 35, 36, 41--6.**. Akridge's records noted he needed more schools and he had four (4) years less Seniority than Hicks. (evals. and records of  Akridge PX-32).

**27, 35, 36, 41--7.** Lamb's records showed improvement, but repeatedly indicated he needed to increase productivity as he was producing at the bottom of his shift, and he only "meets standards" on most of the criteria. (evals and records Lamb PX-33).

**27, 35, 36, 41--8**. Verhine's most recent evaluations stated he needed to be more proactive and needed more schools. (Verhine records PX-103).

**27, 35, 36, 41--9**. Hicks had evaluations "exceeding expectations", no disciplines since he became an officer, many outside schools and seniority, yet he went backwards in the rankings from 9 to 10.  (evals PX-46, PX-12, PX-30).

**38.** Admit, however, Hick's evaluation just preceding this ranking memo states,

> Officer Hicks is a veteran officer who needs little direct supervision. Officer Hicks works well with his fellow officers and interacts well with the public. Officer Hicks works hard and can be counted on to make well informed decisions during his shift, Officer Hicks has been to several schools during the past evaluation period in an effort to better himself as a police officer,

 and states, "n/a" in areas in need of improvement. (PX-46 Eval. 9-2-14).

**39**. Denied. Pursuant to policy, seniority must be considered when making officer assignments and can only be overridden by the Chief of Police. (Policy Seniority – PX-48; Dep. Chief PX-91, p. 74; Dep. Hicks PX-1, p. 380, PX-6, PX- 82, PX-30, and PX-12 (number of years is listed as a consideration on the board memo's).

**42**. Denied, Irrelevant, and not a complete sentence. Hicks testified he is not a lawyer and doesn't know what evidence was produced in discovery. (PX-1, p. 480-483)[1].

**43**. Denied. Two board members and the decision maker were biased. See below.

**43-2**. **January 7, 2015**, Hicks was ranked 10 by the board which consisted of Lt. Richardson, Simpson, Hart, and Sebo Sanders. (Ranking memo, PX-82).

---

[1] Deposition questions requiring Plaintiff to make a legal determination, are inappropriate. Robinson v. Cooper Tire and Rubber Company, 2014 WL 12013435 at 2 (N.D. Ga. 2014).

**43-3.** Chief Anderson was involved in Mrs. Hicks' case and was later found by the jury to have discriminatory intent as he spoke to Captain Robertson to make sure her demotion from narcotics to patrol did not look like it was based on her pregnancy (this admission by Robertson was audio recorded)), and due to the fact he testified he didn't care what medical documentation Ms. Hicks' provided to him, he was not going to give her alternative duty for breastfeeding. (Tr. Trans. PX-83, p. 1133-1141, 1188-1189; Special Interrogatories, PX-84; PX-91, p. 11, 17, 19-20).

**43-3.** The Chief was aware Richardson said bad things about Mrs. Hicks and she took the case personally yet she was on the board. (PX-91, p. 108, 110).

**43-4.** Hicks being out of APOSTC is not mentioned during the selection. (PX-82).

**43-5.** The Board handwritten notes were discarded. (PX-28, p. 37-38, 41).

**43-6.** Sebo Sanders was an alleged witness to Mr. and Mrs. Hicks' statements about Mrs. Hicks' discriminatory treatment in WANTF. (Tr. Trans. PX-23, p. 819-821).

**43-7.** However, at trial, it was discovered Sanders' had been Giglio'd, was determined to have no credibility, and  was banned from testifying in Federal Court. (PX-23, p. 884-886; PX-91, p. 26).

**43-8.** Lt. Richardson was heavily involved in the case as her actions (falsifying evaluations, falsifying write-ups, and demoting her because of post-partum) formed the basis of some of the claims.  (PX-16; Tr. Trans. PX-80, p. 504-511 (where order

could not have happened in April because bail bond act didn't go into effect until June); PX-84; PX-11, 1040-1043, 1049 (where Hicks was not over the mileage).

**43-9.** Lt. Richardson admitted she was displeased Snyder limited Hicks' duties or place her "on call" during her pregnancy. (PX-80, p. 461-462).

**43-10.** Lt. Richardson was angry Mrs Hicks had taken 12 weeks of FMLA so she wrote up Mrs. Hicks for *Mr. Hicks* driving her vehicle on duty, which she herself admitted in an email, was not a violation of policy and failing to change the oil when she had not surpassed the mileage interval. (PX-80, email PX-24).

**43-11.** She called Mrs. Hicks a "stupid bitch" and said she would find a way to get rid of her after Mrs. Hicks noted she was trained as duties were limited because of pregnancy. (Tr. Trans. PX-25, p. 388-390; eval PX-26).

**43-12.** Lt. Richardson also called Mrs. Hicks a "cunt" claiming "she knew she got six weeks, not twelve" for FMLA. (Tr. Trans. PX-27, p. 696-697).

**43-13.** Lt. Richardson made false allegations against Mr. Hicks during the trial. (PX-1, p. 231).

**43-14.** During the trial, the Honorable Magistrate Putnam called the parties into chambers to discuss his concerns of Richardson pressuring witnesses as he observed Lt. Richardson following witnesses into the hall and talking to them. (Tr. Trans. PX-29. P. 1088-1090).

**43-15.** Both of the City's lawyers explained Lt. Richardson had no role at trial, she had not been assigned to handle witnesses, and represented they thought Richardson was offended by the case. (Tr. Trans. PX-29, p. 1088).

**45, 46**. Denied. Hicks went back on approved FMLA leave May, 2015. (FMLA application, PX-59; FMLA approval PX-100; Dep. Hicks PX-1, p. 327).

**47, 48**. Denied. Hicks was not required to qualify until March/April 2015, he was on approved leave when it was offered, and the city only required once per year. Dep. Vaughn PX-19, p. 12-16, 135-137; Powell, p. 103:7-10; *See* ¶17-18 above).

**50**. Denied. Maj. Gibbs, Carroll and the Chiefs office were notified. See below.

**50-2**. **October 9, 2014**, Vaughn (training commander) sent an email to Maj. Gibbs (Hick's second line supervisor), Lt. Reed, Michelle Carroll, (the training assistant), Pam Washington[2] (the Chief's assistant), and Lt. Mason (internal affairs), accusing Hick's of being 18 months out of certification. (emails PX-18; PX-40, p. 93).

**50-3**. Once Vaughn realized Hicks' APOSTC had not lapsed, he informed Maj. Gibbs to make sure Hicks' re-qualifies when he returns from leave before going back on patrol. (PX-18).

**50-4**. Both Carroll and the range master maintain a list of officers who qualify each year. (PX-99, p. 99-100; PX-19, p. 117, 131; PX-1, p 104).

---

[2] Washington testified she is both the right hand and left hand of the chief and she has no discretionary authority. (PX-21, p. 9, 14-15).

**50-5.** At the end of the 2014 year, while Hicks' was still on leave, Carroll, in training, realized again Hicks was out of recertification. (PX-20, p. 33).

**50-6.** Vaughn acknowledges he should have known he was out of APOSTC because of the October, 2014 email. (PX-19, p. 100).

**53**. Denied. This is not Hicks testimony. Hicks testified he could see where it would be a negative. (PX-1, p. 243). However. Webster and Bailey had issues with APOSTC that were not considered yet they received the position. See below.

**53-2.** Bailey previously received an informal counseling, then a formal counseling for defective workmanship as he could not *pass* APOSTC in 2005, 2010, 2012, 2013, and 2014 yet this was not reflected in Powell's synopses. (Baily APOSTC records and disciplines, PX- 78; PX-58, p. 117, 127-130 ;PX-19, p. 127-128).

**53-3.** At the time the selection for FTO was made, Bailey was placed in remedial on December 9, 2015 because he did not pass APOSTC. (PX- 78;  PX-1, p. 459).

**53-4.** Bailey did not have APOSTC scores for years, 2008-2009[3].  (PX-58, p. 116).

**53-5.** Bailey's APOSTC problems and disciplines were not reflected on the synopses prepared by Powell and not considered by the board. (PX-54; PX-79, Powell notes).

---

[3] The City did not produce records reflecting Bailey's scores for these years after numerous requests and until after a deposition where it was pointed out the records were missing. (PX-58, p. 116; PX-19.p. 11). The records produced were handwritten and there is no way to verify the metadata. Bailey is still employed at TPD and can fill out handwritten documents at the City's request.

**53-6.** Sgt. Powell's synopses acknowledged Bailey did not have investigative experience, and states he only had one avail warning letter and no other issues. (PX-58, p. 115; PX-54).

**53-7.** Webster, who received the position, did not qualify at all in 2005. (PX-108).

**55**. Denied. **November 18, 2015**, Hicks regular training day was scheduled, however, he was at Children's Hospital for a follow up with his son on a preapproved absence. (Interdepartmental on recert. PX-53; PX-1, p. 446).

**56**. Denied. Hicks learned he was out of certification on November 25, 2015. (PX-1, p. 99, 104, 138, 140).

**57. 70, 73, 82, 85, 93**. Denied. Irrelevant and mischaracterized. Hicks also testified he is not a lawyer and doesn't know what evidence was produced in discovery. (PX-1, p. 480-483, *See* Fn 1, and ¶ 62, 72).

**60**. Mischaracterized. Sgt. Powell contacted other applicants who stated they were unwilling to change their shift, to see if they would be willing to change their shift to an available shift before he sent the selections list up the chain of command. (PX-58, p. 54-56, 90; PX-56).

**60-2.** Sgt. Powell admitted he did not contact Hicks to change shifts. (PX-58, p. 90).

**62, 72.** Denied. Chief (through Washington) and Vaughn were involved with reporting Hicks to IA when he was not out of certification in October, 2014, Chief (through Washington) and Powell "shredded documents" and prepared a memo

14

claiming relevant documents were shredded and "documenting" selection board by memory that occurred four months prior and the shredding machine is located in Chief's office. (*See*  email PX-18; Meta Data establishing Washington created the memo, PX-57; PX-56; PX-21, p. 9, 14-15 (where Washington testified she did not have discretionary authority; *But See* where Powell claims to have written the entire memo in his office in the basement).

**63**. Denied. The board had a packet on each candidate including a *synopses* review of the officer's personnel file, the shift file and depending on the situation, a review the training file. (PX-40, p. 19; PX-54; PX-58, p. 18, 38, 40-41, 66).

**63-2.** The board also had emails from the applicant's supervisors and FTO peers. (PX-58, p. 25-26).

**64**. Denied. The synopses modified on **December 7** stated Hicks had no write ups, "WILL NOT move shift or location", has no APOSTC for two years, and is "currently not allowed to go back to work until completing APOST and retraining" which was false as Hicks had passed APOSTC on **December 5** and was in patrol. (PX-54; PX-20, p. 26; Range record PX-51; email PX-70; PX-40, p. 50; PX-58, p.108; PX-1, p. 163)

**64-2.** The memo indicated Hicks had issues with APSOTC, "as well as having missed several department mandated trainings that were never made up" (PX-65).

**64-3.** Maj. Gibbs is unaware of any training Hicks missed, and records reflect Hicks did not need to make up any CE's. (PX-40, p. 81-82; PX-93; PX-92, p. 54; PX-19, p. 99; PX-1, p 109 (where Hicks was on approved leave when scheduled).

**64-4.** Parker had a DUI which was later dismissed. However, he lost his license, and continued to drive on patrol for an entire year before he was written up for failure to have a license which is required to perform the job none of which was included in Sgt. Powell's synopses. (PX-58, p. 163-169; PX-88, Parker's disciplinary; PX-54).

**64-5.** Burroughs had only four years in patrol, no investigative, will not change shifts, informals for unkempt uniforms, conduct unbecoming two times in 2013, missing training day in 2013, and late for work in 2011, and numerous citizen complaints which was not included in Sgt. Powell's synopses. (PX-58, p. 118, 130-137; PX-54; PX-85 Burroughs disciplines).

**64-6.** Hall had two avail letters, had been talked to about his rudeness, had an informal regarding his handling of a DUI suspect, a formal regarding officer safety when entering a residence, and citizen complaints, including one complaint where Hall had gotten drunk at a bar, left his badge on the table, left the bar, struck a car, and left the scene without telling anyone, most of which was not listed on Sgt. Powell's synopses. (PX-54; PX-58, p. 139-148, 150-152; PX-86 Halls Disciplines).

**64-7.** Mason received an informal regarding how he handled allowed DUI suspect to leave the emergency department before his blood alcohol level was taken not in the synopses. (PX-58, p. 159-160; PX-87).

**64-8.** Smith had an intradepartmental for being late on January 21, 2015 which was not included in the synopses. (PX-54, PX-58, p. 171-172)

**64-9.** Verhine, Mason (4), and Burroughs (3) evaluations established they needed more schools. PX-103, PX-87).

**64-10.** Bailey's evaluations the two years preceding his selection showed he had not attended any outside schools for training, needed to be more proactive, and received a citizen's complaint on his lack of professionalism. (PX-79).

**64-11.** The City never produced 2005-2006 performance appraisals for Webster, 2014-2015 performance appraisals for Smith, and 2014 performance appraisal for Burroughs (the same year he received all of the citizen complaints) so these documents could not have been considered.

**65**. Denied. At the time of the selection, Bailey had not passed APOSTC and was sent to remedial with Hicks on **December 9**. (PX-1, p. 459; PX-78).

**66.** Denied in part. Hicks was never placed on administrative leave until after his resignation, and was not prevented from working in patrol as he immediately passed APOSTC on **December 5**, upon return from being out sick. (PX-20, p. 26; Range record PX-51; email PX-70; PX-40, p. 50; PX-58, p.108; PX-1, p. 163).

**66-1**. **December 2-4, 2015**, Hicks called in sick pursuant to policy. (PX-68; PX-69).

**66-2.** He was suffering from depression, however, he is not required by policy to give an explanation of his sickness. (PX-1, p. 73, 145).

**66-3.** If an officer is sick, he is supposed to reschedule. (PX-19, p. 19-20).

**66-4. December 2, 2015,** Gibbs and Cpt. Palmer emailed back and forth about Hicks' recertification. (PX-68).

**66-5. December 5, 2015**, Hicks appeared for work when Lt. Sellers and Cpt. Palmer (on his day off) sat Hicks down and aggressively asked him why he hadn't requalified, and asked him to write a departmental. (PX-95, PX-53; PX-1, p. 74).

**66-6.** Hicks explained he was out for two surgeries and for the birth of his baby and Hicks explained he did not think about it. (PX-95).

**66-7.** Cpt. Palmer took Hicks to the range, and Hicks explained to Cpt. Palmer he was out sick on December 2 because of depression and was seeking help from EAP. (PX-1, p. 412-413).

**66-8.** Firearms instructor Cpt. Palmer administered the test, and Hicks shot a 92, which is over the passing score of 70. (PX-20, p. 26; Range record PX-51; email PX-70; PX-40, p. 50; PX-58, p.108; PX-1, p. 163).

**67, 68**. Denied in part. Hicks contacted EAP and scheduled the first available appointment which was December 9, 2015. (PX-1, p. 24-25).

**69**.  The Complaint was not verified and is not evidence in this case and is hearsay am is not admissible. Fed. R. Evid. 801, 804, 805.

**75**. Denied. Webster and Bailey does not have a qualification for two years, and Nolan has repeatedly gone two years (2012, 2015, 2016) while on FMLA. (PX-108, PX-58, p. 116, fn. 3).

**77.** Denied. It was not false. He was on approved leave (FMLA for two surgeries and the birth of his baby, then light duty, ect). (PX-17, PX-19, PX-102, PX-17, PX-101, PX-1, p. 105, 122, 126; PX-59, PX-100).

**79**. Denied and mischaracterized. Hicks was not simply having more target practice. Hicks was required to shoot twice even though he passed and was required to go to remedial which was his was disciplinary. (PX-68 (where Vaughn calls it remedial training), PX-107).

**80**. Denied. Nowhere in the cited testimony does Hicks say he should practice at least twice. This also assumes Hicks did not practice, when Hicks testified he did practice, he just didn't remember the dates. "Blessing" was Mr. McIlwein's word. (PX-1, p. 30-32, 33-36, 42-44, 159-67, 286).

**81**. Denied. Policy states in order to qualify for remedial training, an officer must fail two times and cannot come back to work until he qualifies. (PX-40, p. 31, 47; Policy PX-38; PX-58, p. 108; PX-1 p. 162, 165-166).

**81-2.** Officers who fail APOSTC have their service weapon taken. (PX-40, p. 32).

**83**.  Mischaracterized**.** Hicks' was disciplined three times for failing to qualify while he was on approved leave when he was not required to qualify. (PX-107; (Dep. Hicks PX-1, p. 72, 75).

**84**. Denied. Hicks was given a "disciplinary action form", and was charged with defective workmanship. (PX-41, PX-71). The Tuscaloosa Code clearly shows it is a class C disciplinary offense. (Tuscaloosa Code 19-91(c); PX-1, p. 78)

**87**. Denied. Hicks followed chain of command. All of his supervisors Palmer, Gibbs and Chief were involved. (PX-1, p. 69-70, 76-77).

**91**. Denied. Audio is clear he received the counseling and Gibbs states he didn't know going to resign. (PX-72).

**92**. Chief now claims Hicks was placed on administrative leave because of the stress associated with his wife's lawsuit and claims he was unaware Hicks had been released from EAP. (PX-91, p. 31-32). This is completely inconsistent with the evidence. *See* PX-72 (where stress is nowhere mentioned as reason for leaving, as Hicks informs his supervisor he has a new job).

## II.    PLAINTIFF'S STATEMENT OF ADDITIONAL UNDIPUTED FACTS

1.    **August 2013**, Hicks applied for Field Training Officer (FTO). (PX-6).

2.    **August 23, 2013**, Nolan was ranked 1 and Hicks was ranked 2 for FTO, which is good for 6 months, but the position was mysteriously never filled. (memo PX-6).

3.      Nolan did not have APOSTC scores for two years as he was out on FMLA then light duty and he was still ranked one[4]. (PX-104, PX-105).

4.      Sometime around **November or December, 2013,** Hicks, and 33 other applicants, applied for CID.  (Ranking Memo PX-12).

5.      **December 24, 2013**, the City answered Mrs. Hicks' complaint with Chief Anderson's assistance. (Ans. PX-13; PX-91, p. 14).

6.      **January 6, 2014**, Hicks was inexplicably ranked 9 by the selection board for the CID position. (PX-12).

7.      The selection board consisted of Maj. Flowers, Capt. Simpson, Capt. Clark, Lt. Green and LT. Hart.  (PX-12).

8.      The selection board is supposed to review the shift file, the 201 file and the training file when making their selections along with personal knowledge of the candidate. (PX-91, p. 71; PX-92, p. 42; PX-28, p. 33, 39).

9.      The board chose Busby, then Steward and McCaskill, who had less seniority and schools than Hicks, and the Chief ratified the decision. (PX-12).

---

[1] The handwritten APOST record of Nolan for 2012 has never been produced after numerous requests. After a deposition noting the missing score, the City produced a Spillman record alleging he passed for this year, however, this record is suspect as Nolan had been out on FMLA and was placed on light duty during the certification. The coordinator testified no one has ever been certified while on light duty. (PX-2 Spillman; PX-104, Light duty Records; PX-20, p. 47). Everyone can access and modify Spillman records. (PX-20, p. 4-5). Spillman records for other officers were not produced.

10.   Lamb and Akridge were ranked beneath Hicks at 10 and 12 respectively while Verhine was ranked 19, Grammer was ranked 31, and Parker is ranked 32. (PX-12).

11.   **September 25, 2014**, Chief Anderson, Captain Robertson, Officer Busby, Sgt. (Officer at the time) Windham, and Mike Lane were deposed while Lt. (Sgt. at the time) Richardson, Mrs. Hicks' immediate supervisor, watched, appeared angry, and intimidated witnesses. (Dep. pages PX-15; Mrs. Hicks' Dep. p. 61-64; PX-91, p. 16).

12.   **September 26, 2014**, Officers Coffee, Johnston, Kimbrell and Lt. Richardson were deposed and Lt. Richardson watched, and intimidated witnesses. (Dep. Pages PX-16; Tr. Trans. Johnston PX-27, 714).

13.   The whole police department talked about Ms. Hicks' case and her situation was common knowledge. (Coffee PX-62, p. 19-20; PX-27, p. 710; PX-90, p. 64).

14.   Internal affairs does not handle issues with training compliance and there is no reason why IA was copied on the **October 9, 2014** emails accusing Hicks of being out of certification when he wasn't. (Washington Dep. PX-21, 24-25; PX-91, p. 53-54; PX-19, p. 82).

15.   Washington and Maj. Gibbs stated the **October 9, 2014** emails are not the full conversation. (Dep. PX-21, p.26; PX-40, p. 96).

16.   Vaughn admits he doesn't know of anyone else that he notified IA of their failure to appear because they had been on and off of leave. (PX-19, p. 92).

17.   When an officer is on approved leave, training is notified. (PX-18).

18.   Vaughn doesn't know why Washington did not contact him to let him know Hicks restrictions were lifted upon his return. (PX-19, p. 92).

19.   Vaughn admits when an officer misses training *without* approval, he would *only* be required to prepare an interdepartmental. (PX-19, p. 27-28).

20.   **August 12, 2015**, Hicks received a performance appraisal by K. Palmer, and there was no concern of Hicks' being out of APOSTC at that time. (PX-46).

21.   **October 19, 2015**, the City's Motion for Summary Judgment was denied in Mrs. Hicks' case and the case was set for trial in February, 2016. (Order PX-35; PX-91, p. 17 (Chief received notice).

22.   **November 3, 2015**, an FTO position was posted with the only requirement the an officer not be on probation. (Posting PX-36; PX-40, p. 23. PX-58, p. 36).

23.   **November 12, 2015**, Hicks applied for the position by submitting a letter of interest to the Assistant Chief Tubbs. (letter PX-52; PX-58, p. 17).

24.   **November 16, 2015**, Mrs. Hick's case had a pretrial. (Minutes PX-37).

25.   **November 17, 2015**, Hicks received an email regarding his need to complete and submit a newly implemented FTO application package, which gave the applicant the opportunity to list their achievements, awards, why they wanted to be an FTO. (PX-58, p. 19; Sample of current application form PX-77).

26.   Both Hicks and his wife testified they practiced regularly at the range, but could not recall the dates. (PX-90, p. 17-18, 30; PX-1, p. 89, 151).

27.   On **December 5, 2015** Hicks was sent back to patrol, but told to return to training on Wednesday, December 9, 2015. (PX-70).

28.   **December 7, 2015,** Palmer provided Maj. Gibbs information on Hicks evidencing Hicks was on leave when his qualification period came up and that Hicks already shot a 92. (PX-73).

29.   **December 9, 2015**, Hicks returned to the range and shot another passing score of 82 on the test administered by Baisden. (PX-1, p. 163).

30.   On **December 9, 2015**, after he passed APOSTC again, Hicks was instructed to stay for remedial training with other officers that failed to qualify (James Kent and Bailey, who was selected for FTO). (PX-1, p. 459).

31.   Officer Reyes, who had been out of service for two years, was not required by APOSTC to take remedial even though he had a large gap just like Hicks. (emails re Reyes PX-39; PX-19, p. 124).

32.   On **December 11, 2015**[5], the selection board met and did not even rank Hicks. (Synopses PX-54; Rankings PX-65).

33.   The board has no guidelines, they just sit and talk about the candidates. (Powell Dep. PX-58, p. 52).

---

[5] The document used by Lt. Powell for the selection board was created on December 2, edited on December 7 and stated December 4, 2015 in the heading. (PX-55 metadata for document). However, Major Gibbs testified he wrote the date at the top of the document to reflect when things occurred and testified December 11, 2015 is the date he sent it up to the Chief. (PX-54; PX-40, p. 27-28). The rest of the board's notes and documents were shredded by Powell in violation of policy.(PX-56).

34.    According to Maj. Gibbs, the officer's disciplinary history, and AVAIL sick letters are considered. (Gibbs Dep. PX-40, p. 35-36).

35.    According to Maj. Gibbs, informal counseling is also considered, but a counseling itself cannot prevent an officer from getting a different assignment. (Gibbs Dep. PX-40, p. 36, 63, 67).

36.    Sgt. Powell[6] states informal counseling's are *not* considered when making a selection. (Powell Dep. PX-58, p. 154-155).

37.    Maj. Gibbs doesn't recall specifically talking about Hicks' lack of APOSTC recertification during the selection process and doesn't recall whether he learned about it before or after the selection board met.  (Gibbs Dep. PX-40, p. 37).

38.    Maj. Gibbs, states the board's reason for the non-selection is Hicks marked he did not want to change shifts or precincts on his application. (PX-54, Gibbs Dep. PX-40, p.82-83).

39.    Several of the selected officers also put on their application they would be unwilling to change shifts. (PX-65; PX-56; PX-58, p. 89).

40.    Sgt. Powell states the reason Hicks was not selected was because he did not appear for his APOSTC, not his inability to change shifts. (PX-58, p. 110-111).

---

[6] Powell replaced Mrs. Hicks in narcotics when she was demoted based on her pregnancy. He later became Sergeant and was moved back to patrol. (PX-58, p. 123-124). When he replaced Mrs. Hicks, he called Hicks and asked him what is up. (PX-58, p. 125).

41.   City next claimed its reason for non-selection was Hicks was just an average employee, however, Hicks had no disciplines or write ups since being sworn in as an officer in 2006 (PX-54; PX-58, p. 173), he worked in HUD for 4 years before it was disbanded. (PX-2; PX-54), he received glowing evaluations (Evaluations PX-46), he received the Chief's Award for his job performance (Chief's Award PX-44), he had numerous self-initiated schools (Schools PX-45), and he received positive letters from the community. (PX-47).

42.   Next, Sgt. Powell testified Hicks was on administrative leave and could not perform the position, which was false. (PX-58, p. 102, 110).

43.   Finally, Asst. Chief Tubbs stated the reason he was not given the position was because he resigned and would not be able to work the position, and Hicks did not submit his letter of resignation until December 30, 2015 which was not effective until January, 2016. This was after the selection had been made.

44.   **December 16, 2015**, Hicks received a disciplinary action charging him with defective workmanship, a class C disciplinary offense, a minor violation, for his failure to qualify while out on approved leave. (Informal counseling, PX-41; PX-61l PX-40, p. 52-53; PX-92, p. 73; Audio of Counseling, PX-97; PX-1, p.78-80).

45.   Maj. Gibbs admitted scheduling training is the department's responsibility and Hicks failure to qualify was a shortcoming of training, and patrol as well. (PX-40, p. 68; Audio Recording PX-72).

26

46.   No one in training or patrol received discipline for this offense. (PX-40, p. 68; PX-92, p. 63; PX-19, p. 60).

47.   Maj. Gibbs signed off on the counseling form acknowledging his presence even though he was not present. (PX-40, p. 53).

48.   **December 17, 2015[7]**, the Chief ratified (which he doesn't always do) the Selection Board decisions and memorializes it in special order 1348. (Special Order 1348 PX-42; PX-91, p. 91-92).

49.   **December 22, 2015**, Hicks traveled to Human Resources, where grievance complaining he was disciplined three times for the same offense and complained contained false information because he did not tell his supervisor he did not think he had to qualify, stated progressive discipline was discussed when it wasn't, Major Gibbs was not present, and he requested the discipline to be removed from his file because he had a clean record for 10 years. (PX-107, grievance)

50.   **December 28, 2015**, Sedell Bullard contacted Hicks and said he did not file the grievance in the correct location. (PX-72).

51.   Hicks returned to work on **December 30, 2015** to file his grievance, however, the Major Gibbs and Palmer gave Hicks a second disciplinary action charging him with another Class C offense of defective workmanship, because he filed a grievance

---

[7] The City did not produce a signed memo to the Assistant Chief from selection board.

into Human Resources. (Informal counseling, PX-71, Audio recording of meeting, PX-72; PX-92, p. 73).

52.    However, Gibbs admitted turning the grievance in to HR was correct and he did not have to give Hicks the informal counseling. (PX-40, p. 62, 67).

53.    Other officers were simply given a letter when they improperly filed a grievance. (Letter to Todd, PX-76, PX-40, p. 90-91)).

54.    Hicks then gave his letter of resignation which included that he would work out a two week notice to January 22, 2016. (Resignation letter PX-63; PX-40, p. 69-70; resignation release, PX-74; PX-72; PX-1, p. 173-174).

55.    Major Gibbs discussed Mrs. Hicks' case and upcoming trial with Hicks and reflected upon the date of his 2 week notice. (PX-72; PX-92, p. 70-71).

56.    Hicks explained he was resigning because he had another job. (PX-72).

57.    Normally, when someone hands in a resignation, Washington will see if the Chief would like to talk to them, and get the Chief's approval. (PX-21 Dep. Washington, p. 21-22; PX-91, p. 35).

58.    Hicks went back to patrol, but was called back to fill out paperwork. (PX-98).

59.    Hicks was called back in a third time and was placed on administrative leave by the Chief. (Letter re admin leave, PX-75; PX-91, p. 31; PX-99).

60.    No other officer who voluntarily resigned has been placed on administrative leave. Administrative leave is utilized when officers are investigated for

wrongdoing, for a shooting, an IA investigation. (PX-21, p. 23-24; PX-40, p. 34-35 PX-40, 85; PX-91, p. 30).

61.   Hicks was stripped of his gear where there open blinds to the police parking lot and with open door where officers could see. (PX-40, p. 87-89; XP-1, p. 174).

62.   No one had given him an order not to come to work until this moment.  Hicks was then escorted out of the building.  (Recording).

63.   **February, 2016**, Mrs. Hicks' trial occurred. Chief Anderson and Lt. Richardson testified at trial. (PX-91, p. 17).

64.   Hicks was subpoenaed to testify for the Plaintiff, however, he was ultimately not called by the Plaintiff or the Defendant at trial. (PX-1, p. 186).

65.   Chief was notified of officers lying in court, but he never did anything about it. (PX-91, p. 23-24).

66.   Bobby Windham, who testified for the City and was impeached about a phone call was promoted to Sergeant after the trial. (PX-28, p. 24-25).

67.   **April 21, 2016**, Hicks filed his EEOC charge. (EEOC charge PX-43).

68.   In response to the EEOC charge, **April 26, 2016**, four months after Hicks' resignation, an interdepartmental report is created by Michelle Carroll that outlines Hicks' training and leave. (PX-93; PX-19, p. 95)

69.    The document is modified by Vaughn who stated Hicks' to requalify because he had a new weapons light, however, Hicks never had this equipment. (PX-93; PX-94 Meta data for report; PX-19, p. 94).

70.    **April 27, 2016**, four months after Hicks' resignation, a memo is created by Pam Washington, Assistant to the Chief, located on the third floor, whose job duties are performed at the Chief's request, titled "FTO Board Hicks Issue". (PX-56 memo; PX-57 metadata; PX-91, p. 67-69).

71.    The document is later modified by Powell in his office on the first floor, and it incredibly states he shredded the records relating to the selection of the FTO positon. (PX-58, p. 72, 87; PX-91, p. 67).

72.    There is no shredder in Powell's office, but there is one in records, located adjacent to the Chief's office. (PX-19, p. 107-108)

73.    Sgt. Powell does not remember when he went to Major Gibbs and told him he shredded the documents, and Major Gibbs only remembers Powell came to him, but doesn't remember when. (PX-40, p. 38).

74.    Records relating to the selection of employees should have been maintained for three years or if a charge is filed until the final disposition of the charge. (PX-58, p. 63-65; Document retention policy PX-66; PX-91, p. 37-38, 39-40, 43-44).

75.   Sgt. Powell was not disciplined in any way for this violation of policy and there is no interdepartmental report prepared on this issue. (PX-40, p. 39, 42; PX-58, p. 72, 90; PX-91, p. 66).

76.   Interdepartmental reports formalize a conversation, and one normally would have been prepared to reflect this conversation. (PX-40, p. 40).

77.   Powell was promoted around the time after he prepared the memo. (PX-58, p. 126 (where he states he was promoted within two years of May, 2018)).

78.   **April 28, 2016**, the interdepartmental report created by Michelle Carroll in training is finalized by Vaughn after over 20 hours of editing. (PX-93; PX-94).

79.   Vaughn testified he archives training files forever. (PX-19, p. 108-109).

80.   Training records are kept in a centralized location. (PX-19, p. 111).

81.   The Chief admits, in the past, he has gathered evidence to support a legal position. (PX-91, p. 117-119).

## I.    PREGNANCY DISCRIMINATION-RETALIATION

Hicks states one claim for failure to promote to an FTO position posted in 2015 based on pregnancy discrimination-retaliation. Title VII makes it unlawful for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, **testified, assisted, or participated in any manner** in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–

3(a)(emphasis added). Under Title VII, the plaintiff must show that (1) he engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) he suffered an adverse employment action by the employer simultaneously with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. Gupta v. Florida Bd. of Regents, 212 F.3d 571, 587 (11th Cir.2000); Morgan v. City of Jasper, 959 F.2d 1542, 1547 (11th Cir.1992)). Once the plaintiff makes a *prima facie* showing, the burden shifts to the defendant to present evidence that it had a legitimate, nondiscriminatory reason for terminating the plaintiff. If the defendant proffers such a reason, the burden of going forward returns to the plaintiff, who must show that the defendant's proffered reason was a pretext for discrimination. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). However, establishing the elements of McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Smith v. Lockheed-Martin Corp., 644 F3d 1321, 1327 (11th Cir. 2011). A plaintiff may show pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. Id. *See Also*, Yates v. Ala. Agric. & Mech. Univ., 2014 U.S. Dist. LEXIS 45218, *16 (N.D. Ala.

Apr. 2, 2014)(citing Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005)). Outright admissions of impermissible motivation are infrequent and plaintiffs often must rely upon other evidence. Hunt v. Cormartie, 526 U.S. 541, 533, 119 S.Ct. 1545, 1552 (1999). A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir.2008) (holding that the plaintiff established a *prima facie* case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir.2010) (circumstantial evidence necessary to present a Title VII case of discrimination under McDonnell Douglas is "flexible and depend[s] on the particular situation"). A convincing mosaic of circumstantial evidence may be sufficient to allow a jury to infer that retaliatory intent motivated an employment decision. Lockheed-Martin Corp., 644 F.3d at 1328; Calvert v. Doe, 648 Fed. Appx. 925, 929 (11th. Cir. 2016) (applying the "convincing mosaic" standard to a Title VII retaliation claim).

## II.   **FMLA-RETALIATION**

Hicks states two claims for failure to promote to a CID position posted in 2014 and failure to promote to the FTO position posted in 2015 based on FMLA-retaliation for participating in his wife's lawsuit and for taking FMLA leave. The

FMLA protects employees from being discriminated against by their employers for engaging in activity protected by the Act. Strickland v. Water Works & Sewer Bd. Of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001). To state a claim for retaliation under the FMLA, a plaintiff must meet the same elements of any Title VII retaliation claim. Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1234-1235 (11th Cir. 2010). Courts have applied the "convincing mosaic" analyses to FMLA claims. Hill v. Branch Banking and Trust Company, 264 F.Supp.3d 1247, 1263 (N.D. Ala. 2017).

## III.   ANALYSES OF THE ELEMENTS

As the elements for Title VII retaliation and FMLA retaliation are the same, they are analyzed together below.

### A. Protected Activity.

Hicks engaged in several forms of statutorily protected conduct. In December, 2012, Hicks voiced his concern about the discriminatory treatment his wife received in WANTF. During Hicks' employment with TPD, he was married to Stephanie Hicks who filed a FMLA and Pregnancy Discrimination charge and lawsuit against TPD. Thompson v. North American Stainless, LP, 562 US 170, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011)(adverse action against employee whose fiancé worked for the same employer and filed gender discrimination claim constituted unlawful retaliation and employee falls within the zone of interests under Title VII). Hicks testified in his wife's FMLA and Pregnancy Discrimination lawsuit by deposition

34

and was preparing to testify at trial. Testifying in a deposition and preparing to testify at trial are both protected activities under 42 U.S.C. 2000(e)-3(a); 29 U.S.C. 2615 (a) and (b). Hicks also took FMLA leave for two surgeries and birth of a child. 29 U.S.C. 2615 (a) and (b). Each of these activities are protected under the FMLA. Brungart v. BellSouth Telecomm, Inc., 231 F.3d 791, 98 (11th Cir. 2000).

### B. Adverse employment action.

Hicks suffered from adverse employment actions. Failure to promote is an adverse action. Webb-Edwards v. Orange Cnty Sherriff's Office, 525 F.3d 1013, 1031 (11th Cir. 2008). Both CID and FTO include an increase in pay and more prestige. Loss of prestige is a patently adverse action. Doe v. Dekalb County School District, 145, F.3d 1441, 1447 (11th Cir. 1998). Hicks was not given the August 2013 posted FTO position, the December 2013 posted CID position, December 19, 2014 posted CID position, or the November 2015 posted FTO position[8]. Hicks was also disciplined three times, written up and placed on administrative leave. These acts cumulatively rise to the level of adverse employment action.

### C. Causation and Pretext.

---

[8] This lawsuit only includes the last two positions as they were filed within the statute of limitations, but the plaintiff in no way concedes the first two listed positions were not retaliation based on Mrs. Hicks' lawsuit as Mr. Hicks was in the zone of interests under Title VII/FMLA, he expressed his concern in 2012 over the discriminatory treatment she was receiving, and the CID supervisor basically discussed the fact his wife's lawsuit held him back from CID. Thompson v. North American Stainless, LP, 562 US 170, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011).

There is a causal connection between the statutorily protected conduct and the adverse employment decisions. Evidence of pretext may be considered to determine a causal connection and this evidence may overlap. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 286 (3rd Cir. 2000); Wells v. Colorado Dept. of Transportation, 325 F.3d 1205, 1217 (10th Cir. 2003); Soto-Feliciano v. Villa Cofresi Hotels, Inc. 779 F.3d 19, 32 (1st Cir. 2015); Emeldi v. University of Oregon, 673 F.3d 1218 (9th Cir. 2012). Therefore, this analyses will include both causal connection and pretext arguments together.

**1) Retaliation-for taking FMLA leave-2014 CID Posting**

Close temporal proximity can raise an inference of causation. Drago v. Jenne, 453 F.3d 1301, 1307 (11th Cir. 2006). Clearly, Hicks was still on FMLA leave when he applied for CID in 2014 and the decision was made January 9, 2015 just days prior to his return to light duty on January 12, 2015, so his claim for FMLA retaliation based on the ground he took FMLA himself has close temporal proximity. *See* Jones v. Gulf Coast Heath Care of Delaware, LLC, 854 F.3d 1261, 1272 (11th Cir. 2017)(where the three month temporal proximity for causation in FMLA retaliation claims accrue from the date the Plaintiff returns from exercising leave).

**2) Retaliation for testifying in FMLA case-2014 CID Posting**

There was temporal proximity between Hicks' deposition testimony on September 11, 2014 and his application for CID in December, 2014 as well as a

causal chain, and additional evidence establishing causation for said decision. If there is a substantial delay between the protected expression and the adverse action, a complaint of retaliation "fails as a matter of law **only in the absence of other evidence tending to show causation**..." Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004)(emphasis added). Evidence of a causal connection is not limited to timing and demonstrative proof. Joyner v. City of Atlanta, et. al., No. 1;16-cv-1780-TWT-LTW (N.D. Ga. Feb. 23, 2018)(citing Farrell, 206 F.3d at 281; *See Also*, Frazier v. City of Mobile, 2018 WL 692933 *14 (S.D. Ala. 2018); Letieri v. Equant Incorporated, 478 F.3d 640, 650 (4th Cir. 2007). "A retaliation plaintiff may thus 'rely upon a broad array of evidence' to 'illustrate a "causal link" for the purposes of establishing retaliation.'" Taylor v. Cardiovascular Specialists, P.C., 2013 U.S. Dist. LEXIS 186090, at *97-98 (N.D.Ga. 2013). Therefore, when close temporal proximity is lacking, causation may be inferred from circumstantial evidence gleaned from the record as a whole. Id. at 98; *See also* Freeman v. Perdue Farms Inc., 496 Fed.Appx. 920, 926 (11th Cir. 2012) ("[T]he plaintiff need not show as close a temporal connection if he offers other evidence showing causation.").

The courts have routinely found a causal connection even as to retaliatory acts occurring long after the protected activity, where those events are linked by a chain of intervening retaliatory acts." Greathouse v. Premier Beverage Co.. 2009 WL 3429796, at *10 (M.D. Fla. 2009). Courts have deemed the causal connection

37

element satisfied even though the adverse action occurred more than one year after the EEOC charge, where the retaliatory acts commenced shortly after the charge was filed. Bass v. Board of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1117-19 (11th Cir. 2001). In Joyner, the court found a causal connection even with an eight-year gap between Plaintiff's complaint of discrimination and the City's failure to promote, because the Plaintiff alleged others facts tending to make the causal connection plausible. Joyner v. City of Atlanta, et. al., No. 1;16-cv-1780-TWT-LTW (N.D. Ga. Feb. 23, 2018).

Hicks testified on September 11, 2014. Within one month of Hicks' testimony, on October 9, 2014, and the same day Hicks went on FMLA leave himself, the Chief's office and the training department started trying to find reasons to discipline Hicks. Training commander Vaughn falsely accused Hicks of being out of certification and reported this erroneous fact to IA who normally does not oversee training compliance. Taylor, No. 11-4521-TCB-RGV at *98 (quoting Lee v. N.M. State Univ. Bd. Of Regents, 102 F.Supp.2d 1265, 1277 (D.N.M. 2000)(Pattern of antagonism showing circumstantial evidence of causation can be established by showing "heightened scrutiny, negative criticism, differential treatment or violation of standard internal protocol and procedures). The beginning of the email conversation is mysteriously missing and has not been produced though the course of discovery.  Austrum v. Federal Cleaning Contractors, Inc., 149 F.Supp.3d 1343

(S.D. Fla. 2016)(spoliation of evidence is entitled to adverse inference where Federal Regulations require document retention in Title VII cases). Washington doesn't know why Internal Affairs would be included on the emails and admits the emails are not the entire conversation. (PX-21, p. 25-26). Hicks' is entitled to an adverse inference as the emails have not been produced without good reason.

Next, the City did not post the position until December 19, 2014 (selection made in January, 2015), which was three months *and one week* after his deposition testimony on September 11, 2014.  This was the first opportunity for Hicks to apply after his testimony. (*See*, Morris v. Bessemer Board of Education, 2013 WL 549896 (N.D. Ala. 2013)(where school board made employment decision at the end of the year and this was the first opportunity after the protected activity to make an employment decision--causation was established). The Defendant completely ignores the case was ongoing, the protected activity was continuing, and Hicks was expected to testify at the upcoming trial.

Further, on December 24, 2014, when Hicks turned in his application for CID, Lt. Madison asked Hicks whether he felt Mrs. Hicks' case was hurting his changes of promotion, and he told Hicks "there are certain people here that feel you might be disgruntled with the City".  Lt. Madison was basically told Hicks he didn't get the prior CID position because of his wife's case and agreed with Hicks he was in a bad positon. Hicks responded by telling him he loves his job but, he said he also supports

his wife. Hasham v. California State Baord of Equalization, 200 F.3d 1035 (7th Cir. 2000)( remote and vague remarks may be relied upon as probative of discriminatory bias when determining along with other evidence). On January 8, 2018, just days after Hicks expressed his support for his wife within in the discussion about her case (where he testified by deposition) with the supervisor of the positon for which he was applying in CID, he was not selected for the position.

Furthermore, Lt. Richardson was Mrs. Hicks' immediate supervisor and one of the decision makers whose decisions formed the basis of Mrs. Hick's claims. She just observed depositions in Mrs. Hicks' on September 11, 2014, September 25, 2014 and September 26, 2014, and testified herself on September 26, 2014. She was found to be angry that Mrs. Hicks took 12 weeks of FMLA instead of six, called her a "cunt", and said she was a "stupid bitch" claiming she was going to find a way to get rid of her any way she could. Simmons v. Camden Cty. Bd. Of Educ., 757 F.2d 1187, 1189 (11th Cir. 1985) (finding that evidence supported inference of causal connection where employer indicated its displeasure about the protected conduct). She wanted to write up Mrs. Hicks when *Mr. Hicks* drove her vehicle in uniform, on duty, which was not a violation of policy. She made false allegations about *Mr. Hicks* during the trial. Magistrate Putnam called the parties into chambers to discuss the fact Lt. Richardson was sitting in on the trial, and was appearing to influence the witnesses. The City's counsel stated to the Judge that Richardson had no reason to

be at trial, and that she was watching because he believed she was offended by the case. This statement directly contradicts Lt. Richardson's testimony claiming that her attorney had instructed her to handle the witnesses at trial, and she didn't follow or care about the case. <u>Chapman v. A1 Transport</u>, 229 F.3d 1012 (11th Cir. 2000)(The identification of inconsistencies in defendant's testimony is evidence of pretext).

Sgt. Sebo Sanders who also came up in Mrs. Hicks' case as someone who observed Mr. and Mrs. Hicks objecting to discriminatory conduct in 2012 was also on the selection board. It was determined he had been Giglio'd and could not testify.

The Chief of police ratified the decision not to place Hicks in CID. He too was involved in the decision to demote Mrs. Hicks after she took FMLA, he made the decision not to accommodate Hicks with alternative duty for breastfeeding (she couldn't wear a vest and breastfeed at the same time), and he had recently testified by deposition as well. He was found by the jury in Mrs. Hicks' case to have discriminatory intent as he testified it didn't matter what medical documentation she provided, he was not going to accommodate her with the same alternative duty policy it offered to all officers with medical conditions. Testimony in this case established the Chief would send an email to the employees he wanted to be on the various selection boards. All of the events occurred within close temporal proximity of significant events within in Mrs. Hicks' case that Hicks testified in. The cases cited by Defendant state if only *one* person on the board their animus cannot be

imputed to the whole board. Here, we have two people on the board and the final decisionmaker, the Chief of police, having knowledge and animus, coupled with evidence the entire department was talking about the case, and evidence that Hicks' had not received a prior position due to his wife's case.

Finally, Akridge and Lamb were given the position. They jumped numerous slots over Hicks without just cause. The testimony was clear there had to be a significant improvement in performance and their performance evaluations do not support this jump. In fact, Akridge's evaluations all mentioned he was in need of further schools, and Lamb's evaluations established he consistently had productivity issues. Three other officers made significant jumps over Hicks as well when their files did not warrant such a jump. Ash v. Tyson, 546 U.S. 454, 457, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006)(qualifications evidence may suffice, at least in some circumstances, to show pretext). Hicks' evaluations consistently "exceeds expectations" (2009, 2011, 2012, 2013, 2014, and 2015), he had no disciplines or concerns on his evaluations, he had positive citizen letters, he received the Chief's Award for his performance. There was no legitimate reason for Hicks to go backwards and for Lamb and Akridge to jump forward to receive the position.

**3) Retaliation for testifying in FMLA and Pregnancy Discrimination case for 2015 FTO posting**

The Plaintiff adopts subsection C-2 as if fully set out herein. There is a temporal proximity, a causal chain, and additional evidence establishing Hicks'

**deposition testimony** and **preparation to testify at trial** caused the decision not to promote him to FTO in 2015. The only evidence of who was on the board is a memo created in the Chief's office after Hick's charge of discrimination which evidenced the relevant documents were shredded. Powell received a promotion after this memo was created. Further, Hicks notified the Chief's office immediately upon his restrictions being lifted in April as required. Pam Washington, from the Chief's office, was supposed to notify training his restrictions were lifted, then training was supposed to contact Hicks to requalify before he was placed back on patrol. Clearly, this was not done as no one from training contacted Hicks to requalify. He was sent back to patrol without re-qualifying even though Vaughn told Major Gibbs to make sure he requalified before going back to patrol. This failure to contact Hicks coupled with the facts training and the Chief's office were already involved in falsely accusing Hicks of being out of APOSTC and notifying IA he was out of certification when he wasn't, and the fact the Chief was highly involved in Mrs. Hicks' case -- establish a deviation from policy, discriminatory intent, and causal connection and pretext. (Walker v Prudential Property and Cas. Ins. Co., 286 F.3d 1270 1279 (11th Cir. 2002)(The deviation from policy is pretext). Other officers, Kline and Nolan, were contacted by training upon their return from leave before being placed back in patrol. Inconsistent application of policy is also evidence of causation and pretext.

Furthermore, all of the events coincide with significant events in Mrs. Hick's case- the case where Hicks testified.  The selection occurred just two months before the case went to trial and Hicks was scheduled to testify. Retaliating against an employee preparing to testify is also a violation of both the FMLA and the Pregnancy Discrimination Act.

Also, on November 25, 2015, Hicks volunteered to qualify, but was told to wait until December 2, and sent back in patrol even though there was a firearms instructor, Sgt. Castleberry right there who could have administered the test. Another firearms instructor, Kronister, also told Hicks to hurry up and shoot at the range when he went to practice. He too could have administered the test. He would have knowledge Hicks was not APOSTC certified as there is a log of officers kept at the range. Padilla-Owens v. Sandia Nat'l Labs, No. 02-0448 JB/WDS, No. CIV 02-0448 JB/WDS, 2003 WL 24153912, at *12 n.6 (D. N.M. Nov. 25, 2003) (noting that responding to an employment situation in a way different from ordinary policy can support an inference of causal connection). Telling Hicks to wait to certify and sending him back to patrol is an inconsistency in their position that he could not patrol, an inconsistency in testimony and an inconsistency in the application of policy, all of which are evidence of causation and pretext.

Further evidence of causation and pretext is that the City's stated reason for not selecting Hicks for FTO has shifted over time and is inconsistent among

members of the selection board as follows: 1.Major Gibbs remembers the reason was that Hicks stated on the newly utilized application that he was unable to change shifts an claims APOSTC was not the reason, 2. He's just an average employee, 3. Lt. Powell stated Hicks the reason was he did not complete APOST for 2 years, 4. Chief Tubbs stated he resigned so he would not be able to perform the job duties, and 4. Lt. Powell later states Hicks was on administrative leave and could not perform the duties. Brown v. Houser, 129 Scup. 1357 (N.D. Ga. 2015) *citing* Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3rd Cir. 2000)(shifting reason for adverse action is evidence of causation) *See* Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir.1986);  EEOC v. L.B. Foster Co., 123 F.3d 746, 753–54 (3d Cir.1997), *cert. denied*, 522 U.S. 1147, 118 S.Ct. 1163, 140 L.Ed.2d 174 (1998).; *See Also*, Chapman v. A1 Transport, 229 F.3d 1012 (11th Cir. 2000)(The identification of inconsistencies in defendant's testimony is evidence of pretext).

Next, those stated reasons above were false as Powell admitted he contacted other officers who marked the applications indicating they would not change shifts to see if they would and offered them the position, and admits he never contacted Hicks. Further evidence of pretext and causation is evidence that the requirements for the position deviated from the original posting as there was a change in policy requiring the new applications after the position closed. It was on this application that Hicks stated he would not change shifts. (Mohammed v. Callaway, 698 F.2d

395, 400-01 (10th Cir. 1983)(departure from employment criteria in job posting to the detriment of protected person was probative of discrimination).

Hicks was superior to other comparators as he had no discipline, informal counseling, or citizen's complaints in his file, he had seniority, and he had numerous self-initiated schools. (Ash v. Tyson, 546 U.S. 454, 457, 126 S.Ct. 1195, 1197, 163 L.Ed.2d 1053 (2006)(qualifications evidence may suffice, at least in some circumstances, to show pretext). Hicks was objectively above average as almost all of his evaluations "exceeds expectations". The evaluations mention Hicks is a leader, proactive, self-initiates work, and needs no supervision. Hick's had seniority. He had previously received the Chief's Award. One evaluation even called Hicks a huge asset to the community and the police department. Hicks also served several years in the HUD unit until it was disbanded. Other selected officers had many write-ups, citizen complaints, had less schools, and less seniority. One comparator had his license taken away from a DUI, and another got drunk left his badge at a bar, struck a car on the way out and then left the scene. Clearly, Hicks was superior to these officers who received the position.

By December 7, 2015, the day the synopses was altered, Hicks had already passed APOSTC and was sent back to patrol. Hicks was placed on administrative leave *after* he resigned which was *after* the selection was made so the City could not have relied on this information in making the decision. Powell's statements Hicks

46

was unable to return to work, and that he was on administrative leave at the time of the selection are both false. Chief now claims Hicks was placed on administrative leave because of the stress associated with his wife's lawsuit and claims he was unaware Hicks had been released from EAP. (PX-91, p. 31-32). This is completely inconsistent with the evidence. *See* PX-72 (where stress is nowhere mentioned as reason for leaving, as Hicks informs his supervisor he has a new job).

Comparators Webster, Bailey and Nolan did not complete APOSTC for 2 years, were not disciplined, had significant issues passing APOSTC (Bailey) and was selected for FTO or ranked above Hicks. Other officers (Nolan while on FMLA leave and light duty) and Reyes (while out of service) who were out of APOST for 2 years were not written up or given remedial. The City claims Nolan certified during the two year absence and untimely produced a suspect Spillman record. The City has yet to produce the handwritten score for this year, and it was established anyone has access to Spillman and it could be manually modified. Further, it is clear from training they have never recertified anyone on light duty. Nolan was on light duty when this Spillman record was allegedly created. Hicks' APOSTC certification was never removed. No one in training was disciplined for their part in the failure to schedule.

Finally, the documents relating to the 2015 FTO selection Board were shredded in violation of policy. Austrum v. Federal Cleaning Contractors, Inc., 149

F.Supp.3d 1343 (S.D. Fla. 2016)(spoliation of evidence is entitled to adverse inference where Federal Regulations require document retention in Title VII cases); EEOC v. Am. Nat'l Bank, 652 F.2d 1176, 1195 (4th Cir.1981) ("The affirmative obligation imposed by §1602.14(a) to preserve records was clearly designed to protect Title VII plaintiffs from an employer's destruction of possibly damaging evidence."). There is evidence the Chief's office was involved with the shredding as the creation of the memo explaining the shredding was created by Washington in the Chief's office after Hick's EEOC charge was filed, and it is clearly labeled "Hicks' issue". The claim the documents were shredded at the time the selection was made is suspect as Sgt. Powell was never disciplined for shredding this essential evidence even though it was a clear violation of policy. A jury could believe the documents were shredded as they contained information evidencing retaliation. In the memo created by the Chief's Office, Sgt. Powell claims to recall, four months later, who all was on the board, and the reasons for the non-selection. However, Major Gibbs remembers a completely different reason for the non-selection. Chief Anderson himself expressly admitted in his deposition that there have been instances where he had to go back and find evidence to support legal positions already asserted in court. Finally, there are inconsistencies between witnesses as to how the memo itself was created rendering the substance of the memo and the circumstances surrounding the memo suspect.

Wherefore, based on the foregoing, the Defendant's motion for summary judgment must be denied.

Respectfully Submitted,

/s/Patricia A. Gill

Patricia A. Gill
GIL047
Attorney for Plaintiff,
William Mathew Hicks

OF COUNSEL:
PATRICIA A. GILL, P.C.
PO Box 55304
Birmingham, Alabama 35255
Phone: (205) 789-1906
Facsimile:  (205) 930-9809
E-Mail:  patriciagill@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Evidentiary Submission in Opposition to Summary Judgment has been served on the following by electronically filing the foregoing with the Clerk of the Court using the CM/ECF system on this the 16th, day of August, 2018:

Chris McIlwain                           James Woodson
HUBBARD, MCILWEIN & BRAKEFIELD          PO Box 2089
PO Box 2427                              Tuscaloosa, AL 35403
Tuscaloosa, AL 35403

/s/Patricia A. Gill

OF COUNSEL