**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**WESTERN DIVISION**

| | | |
|---|---|---|
| WILLIAM MATTHEW HICKS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 7:16-cv-01507-LSC |
| | ) | |
| CITY OF TUSCALOOSA, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION**

Before this Court are Defendant City of Tuscaloosa's Motions for Summary

Judgment (docs. 43 & 44.) The motions have been briefed and are ripe for review.

For the reasons stated below, Defendant's motions (docs. 43 & 44) are due to be

granted in part and denied in part.

**I.     Background[1]**

Matthew Hicks ("Hicks" or "Plaintiff") began working for the Tuscaloosa

Police Department ("TPD" or "Defendant") as a patrol officer in September

2006. (Pl. Depo. at 15.) Hicks's wife, Stephanie Hicks ("Stephanie") also worked

for the TPD until she resigned and filed suit against TPD in November 2013,

---

[1]     The facts set out in this Opinion are gleaned from the parties' submissions of facts
claimed to be undisputed and the Court's own examination of the evidentiary record. These are
the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v.
Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

alleging violations of the Family Medical Leave Act ("FMLA") and the Title VII's

Pregnancy Discrimination Act ("Title VII"), as well as constructive discharge. *See*

*Hicks v. City of Tuscaloosa*, Case No. 7-13-cv-02063-TMP, 2015 WL 6123209 at *1

(N.D. Ala. 2015); *Hicks v City of Tuscaloosa*, 870 F.3d 1253, 1253 (11th Cir. 2017).

Pursuant to Alabama Peace Officers Standards and Training Commission

("APOSTC") regulation 650-x-12, all police officers are required to pass annual

firearms qualification training. ALA. ADMIN. CODE r. 650-x-12-.03.TPD requires its

Officers to requalify annually during two training periods. (Pl. Ex. 9.);(Pl. Ex. 38.)

Officers who fail to requalify in a timely manner are not permitted to carry a

weapon or go on patrol. (Pl. Depo. at 55, 318–19.) Officers on FMLA leave, light

duty, or approved leave are often not required to requalify until they return to full

duty. (Pl. Ex. 19 at 12–16.); (Pl. Ex. 20 at 47.);(Pl. Ex. 40 at 55–56.)

When an Officer returns to full duty, the Chief of Police's assistant is then

notified. (Pl. Ex. 19 at 16, 57, 66, 82.) The assistant is then tasked with

communicating this information to the training department ("Training"). (*Id.*)

Training is then responsible for contacting the officer to requalify and scheduling

the firing range for requalification. (Pl. Ex. 49.); (Pl. Ex. 67.) Training often

contacted Officers about requalification through blanket emails. (Pl. Depo. at 216–

18.) Hicks testified that although Training was in charge of scheduling his

requalification, he could requalify anytime as long as an instructor "was out there." (Pl. Depo. at 56–61, 100.)

Hicks qualified with his firearm on November 21, 2013. (Pl. Ex. 8.)[2] On September 11, 2014, Hicks was deposed in Stephanie's lawsuit against TPD. (Pl. Depo. at 81.) The lawsuit was generally known among officers in the TPD. (Pl. Ex. 27.); (Pl. Ex. 62.) On October 9, 2014, Hicks went on approved FMLA leave for shoulder surgery. (Pl. Ex. 17.); (Pl. Ex. 102.) On that same day, an email was sent to Internal Affairs ("IA") concerning Hicks failure to requalify at that time. (Pl. Ex. 18.) Hicks's qualifications were still valid at the time. (*Id.*) Hicks's qualifications later lapsed in November 2014 because Hicks was on FMLA leave and unable to shoot at the time. (Pl. Depo. at 121); (Pl. Ex. 8.)

On December 19, 2014, TPD posted a notice of an opening in the Criminal Investigations Division ("CID"). (Pl. Ex. 22.) Although he was still on leave, Hicks applied for this position. (Pl. Ex. 81.) As Hicks was turning in his application, he spoke with Lt. Madison, a supervisor in the CID, about Stephanie's case. Lt. Madison's comments indicated to Hicks that certain people at TPD believed Hicks was disgruntled because of Stephanie's suit. (Pl. Depo. 221–24.)

---

[2]      Hicks did not requalify again until December 5, 2015.

The decision regarding the CID position was made by a Review Board pursuant to TPD policy. (Pl. Depo. at 195, 208–09.) There is no standing Review Board. Instead, the Chief of Police Steve Anderson ("Anderson") selects individuals to serve on the Review Boards for each new CID job posting. (Pl. Ex. 40 at 15.) The Review Boards meet and review a number of criteria including personnel files and input from the applicant's supervisors, before ranking the applicants. (Hart Aff.); (Powell Aff.) The Review Board Anderson chose for this CID position included Lt. Teena Richardson and Sgt. Sebo Sanders, who were involved in Stephanie's suit against TPD. (Pl. Ex. 23 at 819–21.); (Pl. Ex. 80.)The Review Board met on January 7, 2015, and selected Officers Lamb and Akridge instead of Hicks, who was ranked tenth out of nineteen applicants. (Hart Aff.);(Pl. Ex. 82.) Officers Lamb and Akridge were ranked lower than Hicks in past CID rankings. (Pl. Ex 12.) Anderson ratified this decision on January 8, 2015. (Anderson Aff.)

Later in January 2015, Hicks returned to work on light duty. (Pl. Depo. at 121–23.)  Hicks did not requalify at that time because he was not released for full duty. (*Id.*) In May 2015, Hicks took caregiver leave under the City's Serious Accident and Illness Leave ("SAIL") program for the birth of his second child. (Pl.

Depo. at 326–28, 441–43.)[3] Hicks returned to his full duty in July 2015, but did not requalify at that time. (Pl. Depo. at 129–31.)

In October 2015, Stephanie's case was set for trial in February of 2016. (Pl. Ex. 35.) On November 3, 2015, TPD posted an opening for a Field Training Officer ("FTO") position. (Pl. Ex. 36.) On November 12, 2015, Hicks applied for the FTO position. (Pl. Ex. 52.) Stephanie's pre-trial conference was held four days later on November 16, 2015. (Pl. Ex. 37.) The day after this conference, Hick received notice that he would have to submit an additional FTO application. (Pl. Ex. 58 at 18–20.) Although Hicks was scheduled to requalify on November, 18, 2015, he missed this date due to a pre-scheduled day off. (Pl. Depo. at 443–44.)

When Hicks went to turn in his completed application for the FTO position on November 25, 2015, Hicks was notified by Training that he had not requalified. (Pl. Depo. at 104, 140.) Hicks offered to go requalify immediately, but Sgt. Castleberry, one of TPD's firearms instructors, advised him not to shoot that day and instead had him fill out a request to reschedule his qualification. (Pl. Depo. at 142–143.) Hicks was given a requalification date of December 2, 2015, and sent back on patrol. (Pl. Depo. at 110–11.) Later in November 2015, Hicks asked Sgt.

---

[3]     Although Hicks has adduced evidence that he filled out FMLA paperwork and that he was approved for FMLA leave, the evidence indicates that Hicks's SAIL leave did not qualify as FMLA leave because it was taken after he had exhausted his FMLA leave for the year. (Pl. Ex. 59.);(Pl. Ex. 100.);(Barnes Aff.) *See* 29 C.F.R 825.200.

Chronister, another firearms instructor, to qualify him. (Pl. Depo. at 138–39.) Sgt. Chronister denied his request. (*Id.*)

On December 2, 2015, Hicks missed his requalification because he had taken a sick day. (Pl. Depo. at 145–46.) Hicks's requalification was rescheduled for December 5. (Pl. Ex. 51.) On December 5, 2015, Hicks's scheduled requalification date, he was called into a meeting with Capt. Palmer and asked to write an interdepartmental memo about his reasons for not complying with previous qualification appointments. (Pl. Ex. 73.) Palmer then took Hicks to requalify, and Hicks shot a 92, well above the passing requirement. (*Id.*) Despite passing, Hicks was scheduled to attend additional training on December 9, 2015. (Pl. Ex. 70.) This memo was sent from Capt. Palmer to Maj. Gibbs on December 7, 2015. (Pl. Ex. 73.)

Although TPD asserts that the Review Board met to review candidates for the FTO position on December 4, 2015, Hicks has presented evidence[4] that the document containing the candidates qualifications used by the Review Board was edited on December 7, 2015, two days after Hicks requalified, and sent to Anderson on December 11, 2015.[5] The document noted that Hicks was not willing to move

---

[4]    Plaintiff provided the Court with metadata indicating that the document utilized by Defendant was last edited on December 7, 2015. (Pl. Ex. 55.)

[5]    This listing of qualifications and the Review Board's rankings list are the only remaining documents from the review process that were not shredded by Sgt. Powell in violation of TPD policy. (Pl. Ex. 56.)

shift or location, and that he was not allowed to return to work until he had qualified on APOSTC. (Pl. Ex. 54.) The Review Board did not rank Hicks because of his failure to requalify under APOSTC for two years and missing several department-mandated trainings. (Pl. Ex. 65.) The Review Board noted that the issue of Hicks APOSTC qualification was not known until December 2, 2015. (*Id.*)

On December 16, 2015, Hicks was written up for defective workmanship for failing to requalify. (Pl. Ex. 41.) One day later, Anderson ratified the Review Board's FTO decision in Special Order 1348. (Pl. Ex. 42.) On December 22, 2015, Hicks filed a grievance stating he was disciplined three times[6] for failing to requalify, and on the next day, he was once again written up—this time for failing to follow the proper procedure for filing grievances. (Pl. Ex. 107.); (Pl. Ex. 71.) On December 30, 2015, Hicks was counseled on his grievance and he resigned, effective January 22, 2016. (Pl. Ex. 72.);(Pl. Ex. 74.) Upon turning in his resignation notice, Hicks was put on paid administrative leave by Anderson. (Pl. Ex. 75.) As he left the office, Hicks was asked to return his belt and his gun along with other TPD issued gear. (Pl. Ex. 40 at 87– 89.) After Hicks's termination, Stephanie's suit went to trial. (Pl. Ex. 91 at 18.) During the trial, Hicks was subpoenaed to testify, but he never gave live testimony. (Pl. Depo. at 186.) In April 2016, Hicks filed an EEOC

---

[6]     Hicks claimed he received verbal discipline on December 5, remedial training on December 9, and informal counseling on December 16. (Pl. Ex. 107.)

charge. (Pl. Ex. 43). Following Hicks's filing of the charge, TPD created an internal memo regarding Hicks's situation. (Pl. Ex. 19 at 94–96.); (Pl. Ex. 93.)

## II. Standard of Review

Summary judgment is proper "only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Watson v. Drummond Co.*, 436 F.3d 1310, 1313 (11th Cir. 2006) (citing *Polkey v. Transtecs Corp.*, 404 F.3d 1264, 1267 (11th Cir. 2005)). The moving party has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet this burden, the movant may either present evidence showing there is no genuine dispute of material fact, or show that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322–23. In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and resolve all reasonable doubts pertaining to the facts in his or her favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *U.S. v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991) (en banc) (internal quotation marks and citations omitted))). A factual dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986).

## III. Discussion

Hicks's claims center on the following employment actions: (1) denial of a promotion to a CID position in January 2015, (2) denial of a promotion to a FTO positon in December 2015, and (3) other disciplinary actions taken against him in December 2015. Hicks alleges that these actions were taken for retaliatory reasons in violation of both Title VII and the FMLA.

### A. Title VII Administrative Exhaustion

Valid claims under Title VII must meet all requirements for administrative exhaustion. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970).[7] Administrative exhaustion under Title VII requires filing a timely charge with the EEOC. *Id.* If the EEOC declines to bring its own civil action against the employer, it will issue a Notice of Right to Sue to the employee. 29 C.F.R. § 1601.28(b)(1). Upon receipt of this notice, the employee has a period of ninety days to bring suit against the employer. 42 U.S.C. § 2000e-5(f)(1).

---

[7]     In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc),  the Eleventh Circuit adopted as binding precedent all decisions the former Fifth Circuit handed down before October 1, 1981.

Defendant asserts, in a footnote, that the decision regarding Hicks possible promotion to a CID position occurred more than 180 days prior to Plaintiff's EEOC Charge. Hicks was notified that he did not receive the position in January of 2015, but he did not file his EEOC charge until April 21, 2016. (Pl. Ex. 43.) This passage of time exceeds 180 days. As such, summary judgment is due against Hicks on his Title VII retaliation claims arising out of the failure to promote him to the CID position in January 2015. *See* 42 U.S.C. § 2000e-5(e)(1) (noting that a plaintiff must file an EEOC charge "within one hundred and eighty days after the alleged unlawful employment practice occurred.")[8]

## B. The *McDonnell Douglas* Framework

Absent direct evidence of retaliation, the Eleventh Circuit applies the *McDonnell Douglas* burden shifting framework to both Title VII and FMLA retaliation claims. *See Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 798 (11th Cir. 2000); *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the aggrieved employee must first make out a *prima facie* case of retaliation. *Brown*, 597 F.3d at 1181.

---

[8]     Although Defendant raised its exhaustion argument in a footnote and this likely provided little notice to Plaintiff that such a ground was being raised in briefing, TPD raised a failure to exhaust defense in its amended answer (doc. 26) and the burden remains on Plaintiff to prove that he met all conditions precedent to filing of his suit. *See Jackson v. Seaboard Coast Line R.R. Co.*, 678 F.2d 992, 1010 (11th Cir. 1982).

To establish a *prima facie* case for retaliation under Title VII and the FMLA, a plaintiff must show that (1) he was engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016). Under both Title VII and the FMLA participating in an investigation, proceeding, or hearing pursuant to a charge of unlawful discrimination is protected activity. 42 U.S.C. § 2000(e)-3(a); 29 U.S.C. § 2615 (a)–(b). Additionally, taking FMLA leave is protected activity. *Id.*

To prove an adverse action in the context of a retaliation claim, the plaintiff must show that a reasonable employee would have found the challenged action materially adverse, meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *accord Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008). An adverse employment action need not be as serious as outright termination. It may also include "adverse actions which fall short of ultimate employment decisions," such as written reprimands. W*ideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455-56 (11th Cir. 1998). A failure to promote may constitute an adverse employment action. *Webb-Edwards v. Orange Cnty. Sherriff's Office*, 525 F.3d 1013, 1031 (11th Cir. 2008). *See Davis v Town of Lake Park, Fla.*,

245 F.3d 1232, (11th Cir. 2001) (noting that changes in pay or compensation may constitute adverse actions). The Eleventh Circuit has noted that "the cumulative weight of numerous individual incidents can be considered in determining whether the employee experienced materially adverse action." *Putman v Scty. Dept. of Veterans Affairs*, 510 Fed. App'x 827, 831 (11th Cir. 2013) (citing *Shannon v. Bellsouth Tele., Inc.,* 292 F.3d 712, 716 (11th Cir. 2002)).

As part of his *prima facie* case, a plaintiff must also establish that a causal connection exists between his statutorily protected activity and the alleged adverse employment actions he suffered. *Furcron*, 843 F.3d at 1310. To do so the plaintiff must prove that but-for the employer's desire to retaliate, he would not have suffered the adverse employment action. *Booth v. Pasco Cnty.,* 757 F.3d 1198, 1207 (11th Cir. 2014) (*citing Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 363 (2013)).

A plaintiff can establish a causal connection is if he can show sufficient evidence that the employer knew of his statutorily protected activity and that there was a close temporal proximity between this awareness and the adverse employment actions. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004); *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that the temporal proximity must be "very close"). In retaliation cases under the FMLA for

taking leave, temporal proximity is measured from the last date of leave to the adverse action. *Jones v. Gulf Coast Healthcare of Delaware*, 854 F.3d 1261 (11th Cir. 2017). Title VII measures temporal proximity from the date the defendant becomes aware of the protected activity. *See Farley v Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1337 (11th Cir. 1999) (noting that temporal proximity is measured between "awareness [of the protected activity] and the adverse employment action.")

A claim of retaliation fails as a matter of law "[i]f there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation." *Higdon*, 393 F.3d at 1220. A plaintiff may still establish a causal connection if there is sufficient "additional evidence to demonstrate a causal connection, such as a pattern of antagonism or that the adverse action was the first opportunity for the employer to retaliate." *Ward v. United Parcel Serv.*, 580 Fed. App'x 735, 739 (11th Cir. 2014) (citations omitted); *See Morris v Bessemer Bd. Of Educ.*, Case No. CV-10-BE-240-S, 2013 WL 549896 at *15 (N.D. Ala. 2013).

If a plaintiff has made out a *prima facie* case for retaliation, the burden of production then shifts to the defendant to articulate legitimate, nondiscriminatory reasons for its actions. *Brown*, 597 F.3d at 1181 (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)). Once the defendant has articulated a legitimate,

nondiscriminatory reason for any adverse actions, the plaintiff must "demonstrate that [defendant's] proffered reason was not the true reason for the employment decision . . . [The plaintiff] may succeed in this either directly by persuading the court that a [retaliatory motive] more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Alabama State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005); *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). A plaintiff survives summary judgment if he produces sufficient evidence to allow a reasonable factfinder to disbelieve the employer's articulated reasons for its decisions. *Jackson*, 405 F.3d at 1289; *Rioux v. City of Atlanta,* 520 F.3d 1269, 1278 (11th Cir. 2008) (noting that the plaintiff must show "weaknesses or implausibilities" in the defendant's explanation).

### 1. 2015 CID Decision

Hicks alleges that he was not chosen for a CID position in retaliation for taking FMLA leave[9] and giving deposition testimony in Stephanie's case. Because Hicks's testimony and FMLA leave were protected activity and the failure to

---

[9]    In briefing, Hicks alleges that he was denied promotion to the CID position in 2015 for taking FMLA leave. Hicks's amended complaint does not assert that he was denied promotion because he took FMLA leave. (Doc. 14 ¶¶ 105–08.)  Therefore, the Court analyzes Hick's claim that he was denied the CID position in retaliation for taking FMLA leave for completeness only.

promote him constituted an adverse action, the question becomes whether Plaintiff can establish a causal link between these activities.[10]

In regard to Hicks's FMLA leave and the 2015 CID decision, the Court finds that there is insufficient evidence to create a genuine issue of material fact to establish causation. Although temporal proximity appears to be met because the CID decision was made on January 9, 2015, while Hicks was still on FMLA leave, close timing alone is not sufficient to establish causation. Instead, Hicks must adduce evidence of both temporal proximity and knowledge by the relevant decision maker. *See Brungart*, 231 F.3d at 799 ("temporal proximity alone is insufficient to create a genuine issue of fact as to causal connection when there is unrebutted evidence that the decision-maker did not have knowledge that the employee engaged in protected conduct."). Hicks has established that these events are close in time, but he has failed to present evidence that the relevant decision makers knew he was on FMLA leave.[11] *See Id.* Therefore, Hicks has failed to

---

[10]    Defendant concedes that Plaintiff engaged in protected activity when he gave deposition testimony in Stephanie's trial and seemingly concedes that the failure to promote Hicks to a CID or FTO position was an adverse action because it involved an increase in wages. To the extent Defendant asserts that the CID or FTO positions were not promotions through the use of quotation marks around the word promotion, the Court finds that Defendant's argument is not convincing.

[11]    The CID Review Board for this position included Capt. Simpson, Capt. Smith, Lt. Hart, Lt. Richardson, and Sgt. Sanders. (Hart Aff.) Plaintiff has not pointed this Court to any evidence that suggests any of these CID Review Board members were aware of his FMLA leave or would have been aware of his leave as a supervisor.

establish a causal link between his FMLA leave and the 2015 CID decision and his *prima facie* case fails.

Hicks is able to establish a causal link for the purposes of his *prima facie* case between his deposition testimony in Stephanie's case in September 2014 and the January 2015 CID decision. Without other evidence of causation, a time period of more than three and a half months between protected activity and an adverse action is insufficient to establish temporal proximity. *See Breeden*, 532 U.S at 273–74. Four months passed between Hicks's deposition and the CID position decision. Although TPD argues that this delay bars Hicks's claim as a matter of law, the case law TPD cites for this proposition does not establish that temporal proximity of three months or longer serves as a *per se* bar for claims. Instead, both Supreme Court and Eleventh Circuit precedent indicate that such a time period standing on its own, i.e. without other evidence indicating causation, cannot establish causation. *See Breeden*, 532 U.S. at 273; *Thomas v. Cooper Lighting*, Inc., 506 F.3d 1361 (11th Cir. 2007); *Higdon*, 393 F.3d at 1220.

Hicks has presented additional evidence from which a reasonable jury could find a causal link. *See Freeman v. Perdue Farms Inc.,* 496 Fed. App'x 920, 926 (11th Cir. 2012) ("[T]he plaintiff need not show as close a temporal connection if he offers other evidence showing causation.") Hicks has offered evidence that less

than a month after he gave deposition testimony, he was wrongly reported to IA for failing to requalify with his firearm. (Pl. Ex. 18.) The CID position was then posted on December 19, 2014, three months and one week after Hicks's deposition. (Pl. Ex. 22.) This position was the first job Hicks applied for after the deposition. In situations where an adverse action occurs at the first opportunity defendant has to retaliate, courts have recognized that a delay in temporal proximity may not be fatal. *See Morris*, 2013 WL 549896 at * 15. While the evidence does indicate that this decision was TPD's first materially adverse action against Hicks after he was deposed, the evidence does not indicate that TPD was restrained in making hiring, firing, promotion, transfer, or demotion decisions to certain times of the year such that this decision was TPD's first opportunity to take a materially adverse action.

Nevertheless, Hicks has also presented evidence that both the decision makers for the CID position and officers at TPD had knowledge of both Stephanie's suit and his role in it, and that two members of the five member Review Board for the CID position and Chief Anderson, who ratified the Review Board's decision, were involved in Stephanie's case. Taking this evidence in the light most favorable to Hicks, a reasonable jury could find that a causal link existed between Hicks's deposition testimony and the CID decision. Therefore, Hicks has established *prima facie* case in regard to the CID decision.

TPD asserts that Hicks was not chosen for the CID position because the Review Board did not find him as qualified as the other candidates based on prior performance and the relative qualifications of the other applicants. Hicks challenges this assertion, and argues he was more qualified than the chosen candidates. *See Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 457 (2006) (noting "qualifications evidence may suffice, at least in some circumstances, to show pretext.").

Courts are not in the "business of adjudging whether employment decisions are prudent or fair" but instead are solely concerned with "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). Therefore, "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Cooper v. Southern Co.*, 390 F.3d 695, 732 (11th Cir. 2004) *overruled on other grounds by Ash*, 546 U.S. at 457. The Eleventh Circuit has held that "where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext." *Vessels v Atlanta Indep. Sch. System*, 408 F.3d 763 (11th Cir. 2005).

Hicks argues that Officers Akridge and Lamb, who were chosen instead of him for the CID position, were not as qualified as him. To do so, Hicks relies on past performance evaluations indicating that Officer Akridge needed more schools and the Officer Lamb had productivity issues and the officers past rankings for prior CID positions. (Pl. Ex. 12.);(Pl. Ex. 32.); (Pl. Ex. 33.)[12] In contrast to these performance evaluations, the 2015 CID rankings noted that Officer Lamb "demonstrat[ed] excellent initiative" and Officer Akridge was the "'go to guy' on his shift…[and] a leader among his peers." (Hart Aff. at 2– 3.); (Pl. Ex. 82).

Hicks presents evidence that despite the Review Board's rankings his past performance evaluations indicated that he was consistently ranked as "exceeded expectations." (*See* Pl. Ex. 46.); (Pl. Ex. 30.) Additionally, Hicks offers evidence the he received a number of commendations, had a clean disciplinary record during his time as an officer at TPD, and that he was in line for a promotion based on seniority. (*See* Pl. Ex. 48.) In contrast to these reviews, the 2015 CID rankings noted that "Hicks was "an average officer" and "not very proactive." (Hart Aff. at 2– 3.); (Pl. Ex. 12.)

Ultimately, the Court is not tasked with deciding who the employer "*should have hired.*" *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013)

---

[12]    In January 2014, Hicks, Lamb, and Akridge all applied for another CID position. Hicks was ranked Ninth, Lamb was ranked Tenth, and Akridge was ranked Twelfth. (Pl. Ex. 12.)

(emphasis in the original). While Hicks has presented evidence that suggests he may have had more qualifications, he has not presented sufficient evidence that the disparity in qualifications was enough that no reasonable employer would have picked Lamb or Ackridge instead of him.

Hicks also argues that TPD's explanation is pretextual because the Review Board harbored retaliatory animus towards him. Hicks points to evidence that Cheif Anderson chose the members of each CID Review Board, and that Chief Anderson chose both Lt. Richardson and Sgt. Sebo Sanders, who were involved with Stephanie's claims against TPD, as members of the Review Board for this CID decision. TPD argues that Lt. Richardson's animus towards Stephanie and her case[13] cannot be viewed as animus towards Hicks, but Hicks has presented evidence that Lt. Richardson's animus was related to Stephanie's case. This evidence could be seen by a reasonable jury to indicate that Lt. Richardson's animus reached Hicks and his participation in Stephanie's case. Hicks has also presented evidence that Sgt. Sanders was disqualified from testifying in

---

[13]     Plaintiff has presented evidence that Richardson was deposed in Stephanie's case and actively involved in the events underlying Stephanie's claims. Although Defendant assert that Richardson did not care about the cases, this evidence could be seen by a reasonable jury as indicating that Richardson was involved and invested in Stephanie's case.

Stephanie's trial due to issues with his reliability as a witness. (Pl. Ex. 58 at 41.)[14]

Hicks, however, cannot impute the alleged animus of Chief Anderson, Lt.

Richardson, and Sgt. Sander's to all members of the Review Board. *See Mason v. El*

*Portal*, 240 F.3d 1337, 1339 (11th Cir. 2001); *Conner v. Lafarge North America, Inc.,*

343 Fed. App'x 537, 544 (11th Cir. 2009).[15] Instead, Hicks must adduce evidence

from which a reasonable jury could find that the Review Board as a whole acted

with an unlawful motive.

Hicks has not adduced sufficient evidence from which a reasonable jury

could conclude the Review Board harbored unlawful animus. TPD points to

testimony by one of the CID Review Board's members that Hicks's participation in

Stephanie's case was not considered at the Review Board's meeting. Hicks in

response produces evidence that Stephanie's case was known and discussed by

TPD Officers, including CID supervisor Lt. Madison. Before Hicks turned in his

application, Lt. Madison spoke to him about concerns that "people" had that

Hicks might be disgruntled. While this evidence may demonstrate general

---

[14]     Hicks asserts as evidence of Sgt. Sander's animus that he had been "giglo'd" in
Stephanie's trial. (Doc. 58 at 41.) Sgt. Sanders was alleged to have reported conversations
between Stephanie and Hicks about Stephanie's claims to her supervisor. (Pl. Ex. 23 at 819–21.)

[15]     TPD asserts that in order to surpass summary judgment plaintiff must prove that a
majority of members of a board harbored unlawful animus. The Court notes that many of the
cases TPD cites in support of its argument are cases involving claims under § 1983 where a
majority of board members must harbor animus due to *Monell* concerns.

departmental concern, it could not be seen as evidence of animus by a reasonable jury. *See Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) (noting that a plaintiff cannot "equate constructive knowledge with actual intent.") Therefore, the Court finds that Hicks has not proffered sufficient evidence of pretext, and TPD is entitled to summary judgment on Hicks's FMLA retaliation claim in regard to the 2015 CID decision.[16]

## 2. **2015 FTO Decision**[17]

Hicks also alleges that he was denied promotion to an FTO position in December of 2015 for his protected activities of preparing for trial and taking FMLA leave.[18] Hicks has failed to adduce sufficient evidence to support an inference of causation between his return from FMLA leave in January 2015, and the decision not to hire him for the FTO position in December 2015 because these events lack sufficient temporal proximity and Hicks has not offered additional

---

[16]     The Court notes that if Hicks's Title VII claim regarding the 2015 CID decision were timely, it would fail for the same reasons his FMLA retaliation claim fails.

[17]     Although TPD refers to the 2015 FTO decision as a January 2016 decision, the parties both adduce evidence that the decision regarding the FTO position was made and released in December 2015. Therefore, the Court uses this date instead of the later January 2016 date Defendant utilizes.

[18]      The Court notes again that Hicks's amended complaint does not assert that he was denied promotion because he took FMLA leave. (Doc. 15 ¶¶ 105–08.) Therefore, the court analyzes Hick's claim that he was denied the FTO position for taking FMLA leave for completeness only.

evidence indicating that the relevant decision makers were aware of his FMLA leave. [19]  To the extent Hicks also argues that there is a causal link between the December 2015 FTO decision and his May 2015 leave, the Court finds that no causal link can be established because Hicks's leave in May 2015 was under the City of Tuscaloosa's SAIL policy and not the FMLA as Hicks had already exhausted such leave. *See Rich v. Delta Air Lines, Inc.*, 921 F. Supp. 767, 773 (N.D. Ga. 1996); *Walker v. Elmore Cnty. Bd. Of Educ.*, 379 F.3d 1249, 1253 (11th Cir. 2004) (FMLA "right to leave is provided only to eligible employees" and therefore "does not protect an attempt to exercise a right not provided by the FMLA").

Even if this leave was considered protected activity, the almost five month gap between Hicks's return from SAIL leave in July 2015 and the December 2015 decision is far too long to meet the temporal proximity standard, especially considering the lack of evidence that the relevant decision makers were aware that he had been on FMLA leave.

In regard to Hicks's claims of retaliation under Title VII and the FMLA for participating in Stephanie's trial, the Court finds that Hicks has adduced sufficient

---

[19]    The Review Board members for the 2015 FTO decision were Maj. Gibbs, Sgt. Powell, Capt. Hargrove, Sgt. Palmer, Sgt. Webster, Sgt. Mason, and Sgt. Morgan. (Powell Aff.) Although Hicks has pointed to evidence indicating that Maj. Gibbs held some form of supervisory role over him, such that he would possibly be aware of Hicks's FMLA leave, he has not articulated such an argument. The Court will not make one for him.

evidence to create a genuine issue of material fact as to causation for the purposes of his *prima facie* case. Hicks asserts that this Court should assess temporal proximity from his trial preparation and not his deposition testimony, as both are protected activity. The Court does not restart the clock for the purposes of temporal proximity analysis every time the plaintiff participates in ongoing protected activity. *See Farley*, 197 F.3d at 1337. While a gap of over a year between Hicks deposition and this decision are too far to establish causation through temporal proximity analysis, the additional evidence Hicks presents taken in the light most favorable to him could be seen by a reasonable jury to establish a causal link.

Hicks argues that causation can be established based on the following circumstances surrounding his application for and the decision regarding the FTO position. The FTO position was posted on November 3, 2015, and Hicks applied for the position on November 12, 2015, less than a month after TPD's motion for summary judgement was denied in Stephanie's case and Anderson received notice of this denial. (Pl. Ex. 25.);(Pl. Ex. 35.); (Pl. Ex. 36.); (Pl. Ex. 91 at 17.) Four days after Hicks applied for this position there was a pre-trial conference in Stephanie's case. (Pl. Ex. 37.) The day after this conference, Hicks was required to submit additional paperwork to apply for the FTO position. (Pl. Ex. 58 at 18– 20.);(Pl. Ex.

77.) This additional paperwork included a line asking whether the officer would be willing to change shifts or locations. (Pl. Ex. 77.)

When Hicks attempted to turn in his application for the FTO position on November 25, 2015, he was told for the first time that his APOSTC qualifications were out of date. (Pl. Depo. at 140.) Hicks has presented evidence that TPD was responsible for ensuring APOSTC compliance by its officers and that TPD was in fact aware of Hicks's lapse of certification in November 2014 but they did not individually contact him about this lapse.[20] Hicks has also adduced evidence that his performance evaluation in August 2015 did not note any deficiencies in his qualifications. (Pl. Ex. 46.) Hicks sought to requalify immediately on November 25, 2015— nine days after the pre-trial conference and before the Review Board met to consider his application for the FTO position—, but he was told he had to wait until December 2, 2015, to requalify. Hicks was then sent back on patrol, even though his lapse in qualifications was known and this was contrary to TPD policy. (Pl. Depo. at 140–44.) Hicks tried again to requalify later in November 2015, but he was told that he had to wait until December 2, 2015. Due to a sick day, Hicks did not requalify until December 5, 2015. The Review Board for the FTO position was

---

[20]    Though both parties have referenced blanket emails were sent out by Training about requalification, neither party has presented the Court with an example of these emails and the Court cannot guess what the contents of the emails were or if, in fact, they are evidence that Hicks was responsible for contacting Training to schedule his requalification.

informed of Hicks's failure to qualify for two years on December 2, 2015, shortly before the Review Board met. This evidence taken in the light most favorable to Hicks presents sufficient evidence from which a reasonable jury could find a causal link.

Defendant asserts that Hicks was not chosen for the FTO position because (1) he was not as qualified as the other candidates, (2) his supplemental application indicated that he was unwilling to switch shifts, which lessened his attractiveness as a candidate because the FTO position was for another shift than the one he worked, and (3) he had failed to requalify on his firearm for over two years.

Hicks argues that TPD's explanations are pretextual because they have shifted over time and are inconsistent among the Review Board members. Hicks presents evidence that Major Gibbs concluded that the Review Board's ultimate reason for not choosing Hicks was that he did not want to change shifts or precincts, though Gibbs testified that Hick's APOSTC qualifications were covered as part of the decision. (Pl. Ex. 40 at 82– 83). Hicks also presents evidence that Sgt. Powell initially stated that it was Hicks's failure to requalify that cost him the position, not his unwillingness to change shifts. (Pl. Ex. 58 at 89.) Later in his deposition testimony, Sgt. Powell also indicated that the Review Board discussed the fact that Hicks was being placed on administrative leave as a reason not to

select Hicks for the FTO position. (*Id.* at 102, 110.)[21] At the time, Hicks had not turned in his resignation and was not on administrative leave. Although these explanations may commonly express a belief that Hicks was not as qualified for the position, Hicks has presented additional evidence from which a reasonable jury could conclude that these explanations were false or unworthy of credence.

In regard to Hicks's unwillingness to change shifts, Hicks presents evidence that the information the Review Board received about an officer's willingness to change shifts arose from a supplemental application that was issued on November 17, 2015, the day after pre-trial in Stephanie's case. (Pl. Ex. 77.) Additionally, Hicks presents evidence that although he was not contacted by the FTO Review Board about changing shifts, some of the officers selected for the FTO position were contacted by the Review Board about this, even though they initially indicated that they would also not change shifts. (Pl. Ex. 56.); (Pl. Ex. 58 at 54– 55, 90.); (Pl. Ex. 65.) Although, Hicks's deposition testimony indicates he would not have changed shifts, this evidence taken in the light most favorable to the plaintiff could be seen by a reasonable jury as evidence of pretext. (Pl. Depo. at 14.)

---

[21]     Plaintiff asserts that Assistant Chief Tubbs ("Tubbs") stated that the reason Hicks did not receive the position was that Hicks had resigned. (Doc. 58 at 32 ¶43, 51.) Plaintiff has not pointed this Court to any evidence that corroborates this assertion or that Tubbs was on the Review Board. Therefore, the Court may not consider this fact. *See Helmich v. Kennedy*, 796 F.2d. 1441, 1443 (11th Cir.1986).("[s]tatements of fact in a party's brief, not in proper affidavit form, cannot be considered in determining if a genuine issue of material fact exists.")

Hicks has also presented evidence from which a reasonable jury could conclude that the Review Board's consideration of his APOSTC qualifications is an inconsistent or false explanation. TPD has adduced evidence that the Review Board met and ranked the officers for the FTO position on December 4, 2015. (Powell Aff.) If the meeting did in fact occur on December 4, 2015, the evidence indicates that Hicks had not qualified at the time.

Hicks has produced evidence of metadata indicating that the FTO Review Board document with the candidates' credentials was last edited and saved on December 7, 2015, and sent to Chief Anderson for approval on December 11, 2015. (*See* Pl. Ex. 54.); (Pl. Ex. 55.) Taking this evidence in the light most favorable to Hicks, a reasonable jury could conclude that the Review Board met sometime after December 7, 2015, because that was the last time the document was edited and saved. If the meeting was on December 7, 2015, it would have been after Hicks requalified because he shot a passing score on December 5, 2015. FTO Review Board member Major Gibbs was made aware that Hicks requalified on December 5, 2015, because he received a memo from Capt. Palmer about Hicks requalification on that same day.

There is also evidence from which a reasonable jury could conclude that TPD played a role in Hicks's delayed requalification. Hicks has adduced evidence

that he was not contacted individually about requalifying, even though Training was aware of this lapse as early as November 2014. (*See* Pl. Ex. 18.)While the evidence indicates that Hicks received blanket emails about requalification and scheduling, Hicks has adduced evidence that other officers were contacted individually by their supervisors or Training upon their return to full duty to requalify. (*See* Pl. Ex. 34.)[22] Hicks was given the opportunity to requalify before the Review Board met and by his own admission was able to requalify any time. A reasonable jury taking this evidence in the light most favorable to Hicks could conclude that TPD purposefully delayed Hicks requalification and then later sought to punish him for such a delay. It is a job for the jury and not this Court to make the factual determination of who to believe and whether the blame should fall on TPD or Hicks as both sides have adduced evidence to support their respective conclusions.

Hicks also argues that TPD's explanations are pretextual because he was more qualified than the chosen candidates.[23] Hicks presents evidence that some of

---

[22] Plaintiff alleges that both Officers Nolen and Kline were contacted individually upon their return from light duty to requalify. (Doc. 58 at 43.) Upon review of the evidence that Plaintiff points this Court to in the record, Plaintiff has only presented evidence that indicates Officer Kline was contacted individually. (Pl. Ex. 34.) Nevertheless, this evidence could be seen by a reasonable jury to indicate that other officers were contacted individually.

[23] As evidence that he was more qualified and that reliance on the two year lapse in his APOSTC qualifications was false, Hicks points this Court to evidence that Officer Bailey, who

the officers chosen instead of him had more write-ups than him, and less experience and seniority than he did. Hicks has also presented evidence that one of the Officers chosen instead of him had a DUI and that another Officer chosen instead of him left his badge at a bar and in that same night was involved in a hit and run because he was driving under the influence.[24] This evidence alone may not be sufficient by itself to create a question of fact as to pretext, especially considering that Hicks had not requalified for almost two years but, a reasonable jury, taking the evidence in the light most favorable to Hicks, could conclude based on these differences in qualifications in combination with the other evidence Hicks has presented that TPD's explanations was pretextual.

Lastly, Hicks seeks to establish pretext by seeking an adverse inference. Sgt. Powell shredded the original meeting notes concerning the FTO position, including a listing of who was on the FTO Review Board, in violation of TPD policy. (Pl. Ex. 56.); (Pl. Ex. 66.) Because these notes and applications were shredded, Sgt. Powell drafted a memorandum concerning the FTP position in April 2016, shortly after Hicks' filed his EEOC charge. (Pl. Ex. 56.); (Pl. Ex. 57.) TPD argues and presents evidence that Sgt. Powell shredded these documents on accident as result of his

---

was chosen instead of him, was not qualified at the time he was chosen. The evidence Hicks points this Court to indicates that Bailey shot a score of 72 in June of 2015. (*See* Pl. Ex. 78 at 41.)

[24] The incident involving these Officers occurred in 2012 and 2010 respectively. (Pl. Ex. 88);(Pl. Ex. 86.)

lack of knowledge of TPD policy and therefore an adverse inference is not warranted. (Pl. Ex. 58 at 72, 75–76, 87–88.) *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("Mere negligence in losing or destroying the records is not enough for an adverse inference."). Hicks has not adduced evidence from which this Court could find that the shredding occurred in bad faith or was intentional such as to grant an adverse inference as to the contents. Although Hicks is not entitled to an adverse inference, he has met his burden to demonstrate sufficient pretext to survive summary judgment on his claims arising out of the 2015 FTO position.

### 3.  <u>Other Adverse Actions</u>

Hicks also alleges that TPD's writing him up, sending him to a remedial firearms class, placing him on administrative leave, and stripping him of his police gear and escorting him out of the building when he resigned taken together rise to the level of an adverse employment action. In *Wideman v. Wal-Mart Stores, Inc.*, the Eleventh Circuit found that several instances of discipline in combination with other mistreatment amounted to an adverse action. *See* 141 F.3d at 1455–56. The actions found to be adverse in *Wideman* included listing the plaintiff improperly as a no-show, giving the plaintiff two reprimands and a one day suspension after no prior reprimands, having an assistant manager threaten to shoot the plaintiff in the

head, and a denial of timely medical treatment. *Id.* The Court finds that the combination of the alleged actions taken in the light most favorable to Plaintiff could not be seen by a reasonable jury to rise to the level of an adverse employment action. While discipline taken against Hicks increased as it moved closer to Stephanie's trial, Hicks has not presented evidence or any legal argument that suggests that these actions rose to the level of being materially adverse. *See Davis,* 245 F.3d at 1242 (noting that Title VII's protections "simply do not extend to everything that makes an employee unhappy.").[25] Therefore, to the extent Hicks attempts to bring a legal claim based on these actions in relation to his participation in Stephanie's trial or his FMLA leave, such claims are due to be dismissed.

### C. THE CONVINCING MOSAIC

Hicks argues that he has created a triable issue of fact because the totality of the evidence he has presented creates "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decision maker." *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir.2011) (citations and internal quotation marks omitted)); *see also Benz v. Crowley Maritime Corp.*, 732 Fed. App'x. 794, 804

---

[25]     Defendant also does not offer legal argument concerning whether these actions were materially adverse other than his use of quotation marks around the words "retaliation" and "retaliatory" when referring to the acts Hicks alleges were taken against him.

(11th. Cir. 2018) (finding that a plaintiff was entitled to survive summary judgment on an FMLA Retaliation claim based on the "convincing mosaic" standard when plaintiff adduced evidence that her FMLA leave was discussed by decision makers). This mere recitation is insufficient and therefore the Court finds that Hicks has not created a convincing mosaic. *See Hill v Branch Banking and Trust Co.*, 264 F. Supp. 3d 1247, 1263 (N.D. Ala. 2017) ("[Plaintiff] recites the relevant case law on how a plaintiff may establish a 'convincing mosaic,' but does not explain what facts would compose it in this case. The court cannot construct the picture for her.").

## IV. CONCLUSION

For the reasons stated above, Defendant's Motions for Summary Judgment (docs. 43 & 44) are due to be GRANTED in part and DENIED in part. Plaintiff's Motion to Strike Exhibits 60-62 (doc. 61) is due to be DENIED.[26] An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on January 8, 2019.

L. Scott Coogler
United States District Judge

195126

---

[26] The Court reviewed TPD's supplemental exhibits and found that at least portions of these documents responded to Plaintiff's arguments that he was more qualified and thus were not due to be struck.